NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| MARTIN C. SMITH,<br><br>Appellant,<br><br>v.<br><br>STATE OF ALASKA,<br><br>Appellee. | Court of Appeals No. A-11759<br>Trial Court No. 4FA-10-00357 CR<br><br>O P I N I O N<br><br>No. 2775 — April 26, 2024 |

Appeal from the Superior Court, Fourth Judicial District, Fairbanks, Robert B. Downes, Judge.

Appearances: Robert John, Law Office of Robert John, Fairbanks, for the Appellant. Timothy W. Terrell, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for the Appellee. Douglas O. Moody, Assistant Public Defender, and Beth Goldstein, Acting Public Defender, Anchorage, for the Alaska Public Defender Agency, as *amicus curiae*.

Before: Allard, Chief Judge, Wollenberg, Judge, and Mannheimer, Senior Judge.[*]

Judge WOLLENBERG, writing for the Court.
Judge MANNHEIMER, concurring.

---

[*] Sitting by assignment made pursuant to Article IV, Section 11 of the Alaska Constitution and Administrative Rule 23(a).

Under Article I, Section 8 of the Alaska Constitution, a felony prosecution must proceed by grand jury indictment unless the accused waives indictment. The grand jury functions as "both a shield and sword of justice" — on the one hand, tasked with bringing criminal charges against the accused when this is warranted, and on the other hand, playing a vital protective function by "operat[ing] to control abuses by the government and protect[ing] the interests of the accused."[1] Alaska has strong procedural protections to ensure that the grand jury serves this vital protective function.[2]

History shows that grand juries have, at times, declined to return an indictment even when the evidence clearly supported the felony charges. But Alaska courts have not yet decided the question raised in this case: whether, under Alaska law, the superior court is required to instruct grand jurors that they have discretion to refuse to return an indictment even when they conclude that the evidence supports the proposed charges.[3]

The defendant in this appeal, Martin C. Smith, was indicted on charges of second- and fourth-degree misconduct involving a controlled substance.[4] Smith argues

---

[1]   *Cameron v. State*, 171 P.3d 1154, 1156 (Alaska 2007) (alterations in original) (citing and quoting *Preston v. State*, 615 P.2d 594, 602 (Alaska 1980)); *see also Zurlo v. State*, 506 P.3d 777, 782 (Alaska App. 2022).

[2]   *Cameron*, 171 P.3d at 1156-57.

[3]   *See Wassillie v. State*, 411 P.3d 595, 608 & n.87 (Alaska 2018); *State v. Leighton*, 336 P.3d 713, 715-16 (Alaska App. 2014).

[4]   We affirmed Smith's convictions in a prior opinion. *Smith v. State*, 2018 WL 1779322 (Alaska App. Apr. 11, 2018) (unpublished), *aff'd on reh'g*, 2018 WL 3387387 (Alaska App. July 3, 2018) (unpublished). Smith filed a petition for hearing in the Alaska Supreme Court, challenging, *inter alia*, our conclusion that he had failed to preserve or adequately brief his claim that the grand jury was improperly instructed. The supreme court granted Smith's petition as to this claim and directed this Court to consider it on the merits.
(continued...)

that the grand jury proceedings in his case were fatally flawed because, when the presiding judge convened the grand jury and initially instructed the grand jury panel, the judge did not affirmatively instruct the grand jurors that they had discretion to refuse to indict, even if they concluded that the evidence supported the charges. Indeed, Smith argues that the presiding judge's instructions to the grand jury actively misled the grand jurors by suggesting that they did not have this discretion.

For the reasons explained in this opinion, we reject Smith's contention that Alaska courts are constitutionally required to affirmatively instruct grand juries that they have discretion to decline to enforce the law in a particular case. We recognize that, throughout history, grand juries have exercised a type of prosecutorial discretion — the discretion to decline to indict even when they conclude that the evidence establishes that the defendant committed one or more criminal offenses. Grand juries have also acted as a check on vindictive prosecutions — that is, prosecutions which, although supported by the evidence, are being brought for improper purposes.

But we have not found any support for the notion that the constitution requires the superior court to affirmatively instruct the grand jurors that they have this power — particularly where the grand jury instructions do not expressly foreclose the exercise of this kind of discretion.

We have reviewed the grand jury instructions in Smith's case, and we conclude that those instructions adequately apprised the grand jurors of the grand jury's dual function as "a shield and sword of justice," and that those instructions did not

---

[4]    (...continued)

(The supreme court rejected review of Smith's other challenges.) We subsequently ordered supplemental briefing by the parties, and invited the Public Defender Agency to participate as *amicus curiae*, and we now address Smith's claim of improper grand jury instruction on the merits.

foreclose the grand jurors from exercising discretion (within the confines of the grand jury oath) to decline to indict for reasons other than the insufficiency of the evidence.

Accordingly, we affirm Smith's convictions.

*Overview of the grand jury in Alaska and the instructions in this case*

Under the Alaska Constitution, felony charges must proceed by grand jury indictment unless the defendant waives indictment.[5] This constitutional right to a grand jury indictment "ensures that a group of citizens will make an independent determination about the probability of the accused's guilt 'before the accused suffers any of the grave inconveniences which are apt to ensue upon the return of a felony indictment.'"[6]

The Alaska Supreme Court has repeatedly emphasized the central role of the grand jury in the criminal justice process. In *Cameron v. State*, the supreme court explained that the grand jury acts "as both a shield and sword of justice" — on the one hand, tasked with bringing criminal charges against the accused if charges are warranted, and on the other hand, playing a vital protective function by "operat[ing] to control abuses by the government and protect[ing] the interests of the accused."[7]

---

[5] Alaska Const. art. I, § 8 ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the armed forces in time of war or public danger. Indictment may be waived by the accused.").

[6] *Cameron*, 171 P.3d at 1156 (quoting *State v. Gieffels*, 554 P.2d 460, 465 (Alaska 1976)); *see also Wassillie*, 411 P.3d at 605 (emphasizing "the grand jury's importance as a preliminary step in felony prosecutions" and as a "critical part of Alaska's constitutional framework").

[7] *Cameron*, 171 P.3d at 1156 (alterations in original) (quoting *Preston v. State*, 615 P.2d 594, 602 (Alaska 1980)); *see also Zurlo v. State*, 506 P.3d 777, 782 (Alaska App. 2022).

Later, in *Wassillie v. State*, the supreme court reaffirmed the dual nature of the grand jury's role.[8] As explained in *Wassillie*, the grand jury not only ensures that a felony charge is founded upon probable cause, but it also serves "the invaluable function in our society of standing between the accuser and the accused . . . to determine whether a charge is founded upon reason or dictated by an intimidating power or by malice and personal ill will."[9] The grand jury's protective function is reflected in the strong procedural protections which, under Alaska law, govern the grand jury's deliberative process: Alaska law restricts the admissibility of hearsay evidence at grand jury proceedings, requires the prosecutor to present exculpatory evidence to the grand jury, and authorizes the grand jury to call for the production of additional evidence.[10]

In Smith's case, at the outset of the grand jury's session, the presiding judge of the Fourth Judicial District instructed the grand jury on its powers and duties.[11] Here are the relevant portions of that instruction:

> As grand jurors, you will perform an extremely important function. Under Alaska's Constitution, the grand jury is to determine whether there is sufficient evidence to bring a person to trial. This provision imposes a two-fold duty upon you. First, grand jurors have an obligation to the people of the State of Alaska to compel persons charged with serious criminal conduct to answer for that conduct if there

---

[8] *Wassillie*, 411 P.3d at 607-08.

[9] *Id.* at 608 (omission in original) (quoting *United States v. Mechanik*, 475 U.S. 66, 74 (1986) (O'Connor, J., concurring in the judgment)).

[10] *Cameron*, 171 P.3d at 1157, 1159 (discussing Alaska Criminal Rule 6 and *Frink v. State*, 597 P.2d 154, 164-65 (Alaska 1979), and holding that the prosecutor must inform the grand jury whenever the accused clearly and unconditionally informs the State of a desire to testify before the grand jury).

[11] *See* Alaska R. Crim. P. 6(a), (e)(2).

are just grounds for the charge. At the same time, however, grand jurors have an obligation to every individual to ensure that no one is subjected to criminal prosecution without good cause.

. . . . Once you have heard the State's evidence, along with any additional evidence presented at the request of the grand jury, you must decide whether that evidence, if unexplained or uncontradicted, would warrant conviction of the defendant. If at least ten of you believe the evidence has met that standard, the indictment should be endorsed "a true bill" and signed by your foreperson. If not, the proposed indictment should be endorsed "not a true bill" and signed by your foreperson.

The grand jury was also instructed that the "[g]rand jury proceedings are secret" and "[n]o information about grand jury proceedings or deliberations can be disclosed except in response to a valid court order."

In addition, the grand jurors took the oath set out in Alaska Criminal Rule 6(e)(1). Under this oath, the grand jurors swear to "present no one through envy, hatred or malice," nor to "leave any one unpresented through fear, affection, gain, reward, or hope thereof," but rather to "present all things truly and impartially as they shall come to your knowledge according to the best of your understanding."

*Smith's argument that the court was required to affirmatively instruct the grand jurors of their discretion to decline to indict*

Smith argues that the grand jury charge was deficient because the Alaska Constitution requires the superior court to affirmatively instruct grand jurors that they have discretion to decline to indict, even if they conclude that the evidence supports the charges.

As an initial matter, we note that an instruction that grand jurors have *unbounded* discretion to decline to indict would conflict with the requirements in the

– 6 – 2775

grand jury oath that grand jurors not "leave any one unpresented through fear, affection, gain, reward, or hope thereof" and that they act "impartially."[12] As Judge Mannheimer recounts in his concurrence, there are notable examples throughout history of the grand jury declining to indict that would seem to violate this oath[13] — an oath that, as Judge Mannheimer also explains, has been part of Alaska law since the Carter Code and whose origins date back hundreds of years. Smith contends that the need for the grand jury to serve as the conscience of the community is particularly important in jurisdictions, like Alaska's, where the prosecutors are appointed rather than elected. But prosecutors are subject to a similar limitation on their exercise of discretion.[14]

Smith is correct, however, that the grand jury has historically exercised a form of prosecutorial discretion.[15] Numerous courts have recognized that grand juries

_____

[12]  Alaska R. Crim. P. 6(e)(1).

[13]  As the Ninth Circuit recounts, there have also been historical examples of the exercise of grand jury discretion that have been lauded — reflecting the fact that grand jury nullification has been viewed as serving both positive and negative ends, depending on the circumstances. *See United States v. Navarro-Vargas*, 408 F.3d 1184, 1199 (9th Cir. 2005) (en banc) ("While we celebrate grand jury independence in defense of the First Amendment in the case of Peter Zenger and those accused of violating the Alien and Sedition Acts, and we praise grand jury resistance to the morally-obnoxious fugitive slave laws, we must acknowledge as well that grand juries have also refused to enforce lawful and wise legislation, including some of the most important legislation in American history: the Reconstruction laws implementing the Thirteenth, Fourteenth, and Fifteenth Amendments. Grand jury independence, evidently, has historically served causes both good and ill.").

[14]  For example, the American Bar Association provides that, "[i]n exercising discretion to file and maintain charges," prosecuting attorneys should not consider "partisan or other improper political or personal considerations" or "hostility or personal animus towards a potential subject, or any other improper motive of the prosecutor." *ABA Criminal Justice Standards for the Prosecution Function* § 3-4.4(b) (4th ed. 2017).

[15]  *See* 4 Wayne R. LaFave et al., *Criminal Procedure* § 15.2(g), at 533 (4th ed. 2015) (continued...)

have this discretion.  For example, in *Vasquez v. Hillery*, the United States Supreme Court stated:

> The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not.  In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a noncapital offense — all on the basis of the same facts.  Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be obtained."[16]

Relying on *Vasquez*, two former Alaska Supreme Court justices have echoed this principle: "The grand jury is not bound to indict an accused for a particular crime merely

---

<sup></sup>15   (...continued)
("The grand jury retains its complete independence in refusing to indict.  That includes the authority to refuse to indict even where the evidence presented clearly met the quantum of proof needed for indictment.  This authority of the grand jury to 'nullify' the law arguably was the most important attribute of grand jury review from the perspective of those who insisted that a grand jury clause be included in the Bill of Rights.").

   Prosecutorial discretion is the prosecutor's prerogative to refrain from pursuing a charge even if the evidence supports it.  *See State v. District Court*, 53 P.3d 629, 631 (Alaska App. 2002) (recognizing that "the executive branch has broad discretion to decide whether to initiate criminal charges and, if so, what charges to bring"); *ABA Criminal Justice Standards for the Prosecution Function* § 3-4.4(a) (4th ed. 2017) ("In order to fully implement the prosecutor's functions and duties, including the obligation to enforce the law while exercising sound discretion, the prosecutor is not obliged to file or maintain all criminal charges which the evidence might support.").

   16   *Vasquez v. Hillery*, 474 U.S. 254, 263 (1986) (alteration in original) (quoting *United States v. Ciambrone*, 601 F.2d 616, 629 (2d Cir. 1979) (Friendly, J., dissenting)); *see also Gaither v. United States*, 413 F.2d 1061, 1066 (D.C. Cir. 1969) ("The content of the charge, as well as the decision to charge at all, is entirely up to the grand jury — subject to its popular veto, as it were.  The grand jury's decision not to indict at all, or not to charge the facts alleged by the prosecutorial officials, is not subject to review by any other body." (footnote omitted)).

because there is probable cause. The grand jury may, in the exercise of its discretion, choose a lesser-included offense, or choose not to indict at all."[17]

But even if we assume that Alaska grand juries are entitled to exercise a form of prosecutorial discretion — *i.e.*, the right, like the government, to decline to pursue otherwise valid charges when, for example, doing so would be unjust, or "excessively technical"[18] — Smith has pointed to no historical grounding for the notion that the Alaska Constitution requires courts to affirmatively instruct grand jurors that they have this discretion. As Smith himself recognizes, there are very few jurisdictions that expressly advise grand jurors of their discretion to decline to indict. Indeed, some jurisdictions instruct grand jurors that they have a *duty* to indict if they conclude that there is probable cause — language that goes well beyond the instruction given to the grand jurors in Smith's case.[19]

---

[17] *State v. Markgraf*, 913 P.2d 487, 487 (Alaska 1996) (Matthews, J., with whom Eastaugh, J., joined, dissenting from the dismissal of a petition for hearing as improvidently granted); *see also Commonwealth v. Lee*, 312 A.2d 391, 393 (Pa. 1973) ("It is for the grand jury to determine under which statutes to indict. The grand jury has 'the power to refuse to indict even where a clear violation of law is shown . . . . [It] can reflect the conscience of the community in providing relief where strict application of the law would prove unduly harsh.'" (omission and alteration in original) (quoting 8 J. Moore, *Federal Practice* § 6.02[1] (Cipes ed. 1968))).

[18] *See People v. Sullivan*, 503 N.E.2d 74, 77 (N.Y. 1986) (providing that "[c]onsistent with centuries of history," a New York grand jury may "decide that an excessively technical application of the law upon a particular defendant would work an unfairness that would be contrary to the conscience of the community"); *see also* 24 Daniel R. Coquilette et al., *Moore's Federal Practice* § 606.02[1], at 606-12 (3d ed. 2022) ("[T]he grand jury can reflect the conscience of the community in providing relief when strict application of the law would prove unduly harsh.").

[19] *See, e.g.*, Alabama Jury Instructions I.1.I.A ("[W]henever the legal evidence received by a Grand Jury establishes probable cause to believe that a felony has been committed and

(continued...)

Indeed, the charge that federal grand juries receive has language that appears to limit the grand jury's discretion to decline to indict — and this federal grand jury charge has been upheld against challenges similar to Smith's.[20] The federal grand jury charge does not inform grand jurors of a "two-fold" duty, but rather instructs grand jurors that their purpose is to "determine whether there is sufficient evidence to justify a formal accusation against a person" — defined solely as "probable cause to believe that the accused is guilty of the offense charged."[21] And the instruction later continues,

---

[19] (...continued)
that a particular person has committed that offense, then the Grand Jury must return a true bill of indictment."), https://judicial.alabama.gov/docs/library/docs/General_Jury_Instructions.pdf (last visited Apr. 22, 2024); *In re Standard Grand Jury Instructions — Criminal Report No. 90-2*, 575 So.2d 1276, 1277 (Fla. 1991) (mem.) ("Your duty is only to ascertain whether there is 'probable cause' to believe that a crime has been committed by the person so accused. If the evidence is sufficient to constitute 'probable cause,' then it is your duty to find what is known as a 'true bill.'"); *see also United States v. Navarro-Vargas*, 408 F.3d 1184, 1197-98 (9th Cir. 2005) (en banc) (discussing state grand jury instructions and noting that a majority of the states to have addressed this issue have adopted instructions that imply a duty). *But see* John Raymond Fletcher, Associate Judge, Seventh Judicial Circuit Court of Md., *Charge to a Grand Jury*, 18 F.R.D. 211, 214 (1955) ("The grand jury may even refuse to indict although its attention is called to a clear violation of law. Presumably this would occur only when prosecution without mercy would result in a miscarriage of justice; but the grand jury has that power."); New York Model Grand Jury Impanelment Instruction, at 3-5 (providing that "the grand jury may indict a person for an offense"), https://www.nycourts.gov/JUDGES/CJI/5-SampleCharges/CJI2D.Grand-Jury_Rev.pdf (last visited Apr. 22, 2024).

[20] Among the federal grand jury instructions upheld against challenge is a provision informing grand jurors that they "cannot judge the wisdom of the criminal laws enacted by Congress," and another provision informing grand jurors that they "should vote to indict" when they conclude that "there is probable cause to believe that the accused is guilty of the offense charged." *See Navarro-Vargas*, 408 F.3d at 1187-88, 1202, 1204; *see also United States v. Knight*, 490 F.3d 1268, 1272 (11th Cir. 2007).

[21] *Navarro-Vargas*, 408 F.3d at 1187. The grand jurors in *Navarro-Vargas* received the
(continued...)

"[Y]ou should vote to indict where the evidence presented to you is sufficiently strong to warrant a reasonable person's believing that the accused is probably guilty of the offense with which the accused is charged."[22]

In *United States v. Marcucci* and in *United States v. Navarro-Vargas*, the Ninth Circuit upheld these grand jury instructions against the kind of challenge that Smith presents here. The Ninth Circuit concluded that these instructions sufficiently preserve the grand jury's independent discretion to decline to indict even when the grand jurors conclude that a given charge is supported by probable cause.[23] The Ninth Circuit found that the word "should" did not eliminate the grand jury's discretion to decline to indict.[24] And although the Ninth Circuit recognized the importance of the grand jury's independent screening function, it rejected the assertion that the federal constitution

---

[21] (...continued)
model grand jury charge recommended by the Judicial Conference of the United States. *Id.* at 1186.

[22] *Id.* at 1187.

[23] *United States v. Marcucci*, 299 F.3d 1156, 1164 (9th Cir. 2002) ("The charge, by telling the jury that it 'should' rather than 'shall' or 'must' indict if it finds probable cause, leaves room — albeit limited room — for a grand jury to reject an indictment that, although supported by probable cause, is based on governmental passion, prejudice, or injustice."); *Navarro-Vargas*, 408 F.3d at 1205 ("Even assuming that the grand jury should exercise something akin to prosecutorial discretion, the instruction does not infringe upon that discretion.").

[24] *See Marcucci*, 299 F.3d at 1164; *Navarro-Vargas*, 408 F.3d at 1204 (holding that instructing the grand jurors that they "should" indict if they find probable cause did not violate the grand jury's independence because "[a]s a matter of pure semantics," this wording "does not 'eliminate discretion on the part of the grand jurors'" and it "leav[es] room for the grand jury to dismiss even if it finds probable cause" (quoting *Marcucci*, 299 F.3d at 1159)).

requires courts to affirmatively instruct grand jurors that they have the authority to "nullify" the enforcement of the criminal law in a given case.[25]

Smith urges us to adopt the view of the dissenting opinions in *Marcucci* and *Navarro-Vargas*; he argues that these dissents are persuasive and that the views they espouse should be adopted as a matter of Alaska constitutional law. But the primary concern of the dissenters in *Marcucci* and *Navarro-Vargas* was that, in their view, the federal grand jury instruction was actively misleading.[26] Although the dissenters would have endorsed an affirmative instruction on a grand jury's discretion to decline to indict, the dissenters never suggested that the *absence* of such an affirmative instruction would constitute constitutional error, so long as the grand jury charge otherwise left room for the exercise of grand jury discretion.[27]

Finally, in *Leighton v. State*, this Court implicitly rejected the notion that Alaska law requires an affirmative instruction explicitly endorsing the grand jury's discretion to refuse to indict.[28] We concluded that, in the context of a grand jury charge worded like the one in Smith's case, the word "should" does not set out an inflexible

---

[25] *Marcucci*, 299 F.3d at 1161; *Navarro-Vargas*, 408 F.3d at 1199-1202.

[26] *Marcucci*, 299 F.3d at 1170-71 (Hawkins, J., dissenting) ("A grand jury could be instructed using the language of *Vasquez*, which does not suggest nullification. Or, it could be told either that a showing of probable cause is a necessary requirement for indictment without saying more, or that probable cause is a necessary consideration, but not the only one. . . . Regardless of how new instructions might turn out, as they stand now they are constitutionally unsound because they actively mislead grand jurors into thinking they lack powers which, as articulated by *Vasquez*, are clearly vested in them."); *Navarro-Vargas*, 408 F.3d at 1216 (Hawkins, J., joined by Pregerson, Wardlow, W. Fletcher, and Berzon, JJ., dissenting) ("These instructions are unconstitutional because they actively mislead grand jurors into thinking their powers are more constrained than they are.").

[27] *See, e.g.*, *Marcucci*, 299 F.3d at 1170-71 (Hawkins, J., dissenting).

[28] *State v. Leighton*, 336 P.3d 713 (Alaska App. 2014).

command, but only an "expectation of what ought to be done" with "some inherent flexibility . . . to depart from the expectation."[29] And with regard to the third sentence of Article I, Section 8 of the Alaska Constitution — "[t]he grand jury shall consist of at least twelve citizens, a majority of whom concurring *may* return an indictment" — we concluded that this language did not establish a grand jury's discretion not to indict even after the grand jurors conclude that the evidence supports the charge. Rather, we held that the phrase "may return an indictment" meant "*is authorized to* return an indictment."[30]

We also noted in *Leighton* that, to the extent grand juries in Alaska have a discretionary screening function that derives from the history and role of the grand jury within the structure of the criminal justice system, the language of the grand jury charge in *Leighton* — the same grand jury charge at issue in this case — adequately conveyed this concept.[31]

Smith argues that *Leighton* was wrongly decided, and he — along with the *amicus curiae* — asks us to overrule our holding in that case. In particular, Smith argues that we were wrong in *Leighton* when we concluded that neither the language of Article I, Section 8 nor the debate regarding this provision at Alaska's constitutional

---

[29] *Id.* at 715-16 (omission in original).

[30] *Id.* (emphasis added). We reached this same conclusion as to AS 12.40.050, which provides, "The grand jury may indict or present a person for a crime upon sufficient evidence, whether that person has been held to answer for the crime or not." *Id.* at 716 (concluding that the word "may" in AS 12.40.050 is being used in the sense of "is authorized to"); *cf. Navarro-Vargas*, 408 F.3d at 1188 ("The text of the Fifth Amendment simply provides for the right to indictment by a grand jury and does not explain how the grand jury is to fulfill this constitutional role. Either such details were assumed by the framers of the Bill of Rights or they decided to leave such details to Congress, the Executive, and the Judiciary.").

[31] *Leighton*, 336 P.3d at 715-16.

convention suggested that the framers intended to create or acknowledge a grand jury's discretion to refuse to indict even when the grand jurors conclude that the charge is supported by the evidence.

But the minutes of Alaska's constitutional convention do not support Smith's assertion that the delegates intended for grand jurors to be instructed that they are authorized to refuse to return an indictment even when they conclude that the evidence presented to them supports the criminal charge. Even though the proponents of the grand jury clause argued vigorously in favor of keeping the grand jury as an institution to protect individuals against criminal prosecution based on "flimsy" or insufficient evidence, there is nothing in the record of the convention to suggest that these delegates intended to add grand jury protections that did not exist under the federal constitution — that is, under the federal law that governed Alaska at the time.[32]

_____

[32] *See Wassillie v. State*, 411 P.3d 595, 605-07 (Alaska 2018) (recounting the debate on the grand jury clause at the Alaska Constitutional Convention); *see also* 2 Proceedings of the Alaska Constitutional Convention 1336 (Jan. 6, 1956) (remarks of Delegate Edward Davis, sponsor of amendment to require indictment by grand jury in felony cases) ("I am interested in the occasional person who is charged with crime and who is completely innocent of that crime, and so far as I am concerned if even one person is charged with crime, who is innocent, and who may have the matter disposed of without having to stand trial, it's worth the cost[.]"); *id.* at 1323-24 (remarks of Delegate Ralph Rivers) ("I think [grand juries] serve a useful purpose. Sometimes . . . the grand jury will bring in a 'no true bill' meaning they just refused to accuse anybody because the evidence is too flimsy."); *id.* at 1331 (remarks of Delegate Robert McNealy) ("[O]ccasionally, our appointed prosecutors become a little overzealous and want to secure a number of convictions and in some of those instances a grand jury will return a no true bill."); *id.* at 1334 (remarks of Delegate Mildred Hermann) ("I also have seen the misplaced zeal of some of our district attorneys[.]").

Even though the Fifth Amendment guarantees a right of grand jury indictment in a *federal* felony case, the Fourteenth Amendment's due process clause does not incorporate this right of grand jury indictment against the states. *Hurtado v. California*, 110 U.S. 516, 538 (1884). However, because the Alaska grand jury was derived from the federal model, the historical and structural underpinnings of the federal grand jury right serve as persuasive

(continued...)

In short, Smith has not met his "heavy threshold burden" of demonstrating compelling reasons for overruling *Leighton*.[33]

*Why we conclude that the instructions in this case do not warrant reversal*

Ultimately, Smith has pointed to no persuasive reason why the grand jury charge in his case was so deficient or misleading as to require reversal of his convictions. The grand jury instructions as a whole were consistent with the grand jury's discretion to decline to indict. These instructions explicitly advised the grand jurors that their deliberations were secret and could not be disclosed absent a court order, that they had "an obligation to every individual to ensure that no one is subjected to criminal prosecution without good cause," and that they should hold people accountable for serious criminal misconduct, but only where there were "just grounds for the charge."

Smith takes issue with the word "obligation," arguing that it does not afford the grand jurors any flexibility to decline to indict once they conclude that the evidence supports the charges. We agree that the word "obligation," standing alone, seemingly precludes discretion.

But Smith overlooks the context in which this word appears. Echoing our supreme court's characterization of the grand jury "as both a shield and sword of justice," the presiding judge in this case instructed the grand jurors that the determination

---

[32] (...continued)
authority for interpreting the Alaska grand jury right.

The concurrence interprets the delegates' silence on nullification as an affirmative indication that they rejected the notion that the grand jury was entitled to exercise this type of discretion at all. But given that this discretion has traditionally been viewed as a function of the federal grand jury, the silence was equally consistent with an assumption that the discretion was inherent in the grand jury process.

[33] *Buntin v. Schlumberger Tech. Corp.*, 487 P.3d 595, 603 (Alaska 2021) (quoting *Thomas v. Anchorage Equal Rts. Comm'n*, 102 P.3d 937, 943 (Alaska 2004)).

of whether there is "sufficient evidence to bring a person to trial" imposes a "two-fold duty" on the grand jury: The first of these duties is "an obligation to the people of the State of Alaska to compel persons charged with serious criminal conduct to answer for that conduct if there are *just grounds* for the charge." (Emphasis added.) The second duty is "an obligation to every individual to ensure that no one is subjected to criminal prosecution *without good cause.*" (Emphasis added.)

These concepts of "just grounds" and "good cause" invoke fundamental concepts of justice and fairness that do not imply that the grand jury's task is limited to simply determining whether the evidence is sufficient to establish the defendant's guilt at trial.[34] And nothing else in this grand jury instruction limited grand jurors from considering what would be "just" in a given situation.

Additionally, the grand jurors were required to take the grand jury oath specified in Criminal Rule 6(e)(1), in which the grand jurors swear to "present no one through envy, hatred or malice," nor to "leave any one unpresented through fear, affection, gain, reward, or hope thereof," but rather to "present all things truly and impartially as they shall come to your knowledge according to the best of your understanding."

On the whole, these instructions informed the grand jurors of the grand jury's independence and did not foreclose the possibility of the grand jury's refusing to indict even if the grand jurors concluded that sufficient evidence supported the charges.

---

[34] The concurrence suggests that this analysis takes the concepts of "just grounds" and "good cause" out of context since the judge's prefatory remark explained that under the Alaska Constitution, the grand jury is to "determine whether there is sufficient evidence to bring a person to trial." But the judge then specifically defined this obligation, explaining that this provision imposes upon the grand jury the "two-fold duty" discussed above. There is no reason to think the grand jury would have understood its responsibilities to extend beyond this two-fold task.

Ultimately, the question in this case, as in *Leighton*, is not whether it is *permissible* to instruct a grand jury that it has this kind of discretion. Rather, the question is whether it amounts to constitutional error *not* to expressly instruct a grand jury that it has this discretion.[35]

We conclude that the absence of such an express instruction does not amount to constitutional error.[36] And we further conclude that the grand jury charge in this case did not contravene the notion that grand jurors have discretion to decline to indict even when they conclude that the evidence supports the charges.[37]

---

[35] *Cf. Young v. State*, 374 P.3d 395, 428 (Alaska 2016) ("[W]hether or not a requested jury instruction should be given lies in the discretion of the trial court. [A]s long as the instructions actually given by the trial court adequately set forth the applicable law, a more elaborate explanation of the defendant's theory of the case is not required unless it would substantially aid the jury in arriving at a just verdict." (second alteration in original) (internal quotations omitted)); *Navarro-Vargas*, 408 F.3d at 1208 ("In upholding the model grand jury instructions against Appellants' constitutional challenge, we do not necessarily hold that the current instructions could not or should not be improved. . . . However, we are not a drafting committee for the grand jury instructions. We are not faced with the question of how to reform the modern grand jury but whether its model instructions are constitutional. To answer this question, we hold that the provisions of the model grand jury instructions challenged here are constitutional." (footnote omitted)).

[36] We need not decide the precise boundaries of legitimate grand jury discretion because we find no support for the position that an affirmative instruction on grand jury discretion is constitutionally mandated.

[37] For the first time in his supplemental reply brief, Smith argues that the *prosecutor's* statements during the grand jury orientation would have indicated to the grand jury that their only role was to determine the existence of probable cause. But Smith made no such argument in the trial court, in his initial briefing in this case, or in his opening supplemental brief. Instead, he challenged only the court's instructions to the grand jury. Indeed, a transcript of the grand jury orientation was not even prepared until after the State filed its supplemental brief, at the State's request. Accordingly, any argument based on the prosecutor's statements is waived. *See Berezyuk v. State*, 282 P.3d 386, 398-400 (Alaska

(continued...)

– 17 – 2775

*Conclusion*

The judgment of the superior court is AFFIRMED.

---

[37] (...continued)
App. 2012). In any event, we read the prosecutor's comments as simply explaining the standard by which the grand jury was, in fact, to determine if the charges had sufficient evidentiary support.

Judge MANNHEIMER, concurring.

The defendant in this case, Martin C. Smith, contends that the grand jury proceedings in his case were fatally flawed because the presiding judge of the superior court gave misleading instructions to the grand jury panel that issued the indictment against Smith.

Specifically, Smith asserts that, under the Alaska Constitution, even when the members of a grand jury panel conclude that the evidence supports a proposed indictment, the grand jurors nevertheless have an absolute, unfettered discretion to refuse to issue an indictment — for any reason they see fit. Smith contends that, in his case, the superior court misled the grand jurors by telling them, or at least implying, that grand jurors have a duty to issue an indictment if they conclude that the evidence supports the proposed charge. Indeed, Smith contends that when the superior court convenes a grand jury, the court must explicitly instruct grand jurors that they have an unfettered discretion to refuse to issue an indictment for any reason they see fit.

If Smith is correct, two major provisions of Alaska Criminal Rule 6 (the rule that governs grand jury proceedings) are unconstitutional.

The first of these provisions is Criminal Rule 6(r), which declares that grand jurors "shall find an indictment" if they conclude that the evidence they have heard would warrant a trial jury in finding the defendant guilty. If Smith is correct, it is unconstitutional to tell grand jurors that there are any circumstances in which they are *required* to return an indictment.

The second of these provisions is Criminal Rule 6(e)(1), which requires grand jurors to take an oath that they will "diligently inquire and true presentment make" of all the matters that come before them. This oath requires grand jurors to promise that they will not "leave any one unpresented [*i.e.*, unindicted] through fear, affection, gain,

reward, or hope thereof", but that they will instead "present all things truly and impartially as [these matters] shall come to [their] knowledge according to the best of [their] understanding."

These provisions of the grand juror oath are inconsistent with Smith's contention that grand jurors have an absolute, unfettered discretion to decline to issue an indictment for any reason they see fit. The prescribed oath requires grand jurors to promise that, when they consider exercising their authority to decline to indict someone, they will not allow their decision to be influenced by deference to the defendant's wealth, power, or popularity; nor will they allow their decision to be influenced by a desire to gratify community sentiment or expectations, or by a fear of angering the community. Instead, the oath requires grand jurors to promise that they will render true and impartial justice — that their decisions will not be improperly influenced by the identities of the people involved, nor by such factors as the race, religion, or political views of the people involved.

*A summary of this Court's decision, and my reasons for writing this concurrence*

In this Court's lead opinion, my colleagues reject some of Smith's contentions, but they leave other portions of Smith's argument unresolved.

In particular, my colleagues reject Smith's contention that grand jurors have an absolute, unfettered discretion to decline to issue an indictment for any reason they see fit, even when the grand jurors conclude that the evidence supports the indictment. Instead, my colleagues hold that grand jurors are bound by the oath prescribed in Criminal Rule 6(e)(1) — an oath that forbids grand jurors from refusing or declining to indict a defendant for any of the various improper reasons listed in the oath.

– 20 –                                                                                        2775

I agree with my colleagues that the drafters of Alaska's constitution worked under the premise that grand jurors are bound by the provisions of the oath that is now codified in Criminal Rule 6(e)(1). The origins of this oath are more than a thousand years old, and the oath has existed in Anglo-American law (in essentially its current form) since the late 1200s. This oath was incorporated by reference in the Carter Code of 1900 (the first codification of Alaska law), and this oath was enacted as an express provision of the Alaska statutes by the territorial legislature in 1933. No delegate to our constitutional convention expressed any disagreement with this oath or any doubt as to whether Alaska grand jurors are bound by the provisions of this oath.

Thus, my colleagues and I agree that Alaska grand jurors do not have *unfettered* discretion to ignore the evidence and refuse to issue an indictment for any reason they see fit.

At the same time, however, my colleagues suggest that Smith may be *partially* correct — that Alaska grand jurors may have *some* discretion to refuse to issue an indictment even when they conclude that the indictment is supported by the evidence. Specifically, my colleagues suggest that, so long as the grand jurors abide by the oath set forth in Rule 6(e)(1), Alaska grand jurors may have the discretion to refuse to issue an indictment whenever the grand jurors conclude that the charges are "unjust" or "excessively technical".

But having suggested this possibility, my colleagues then decline to definitively resolve this issue of a grand jury's potential discretion to decline to issue an indictment for reasons apart from the sufficiency of the evidence to support the charges.

Instead of deciding whether Alaska grand jurors have a limited discretion to reject even well-founded felony charges, my colleagues conclude that this issue is moot. According to my colleagues, this mootness arises from the wording of the superior court's initial instructions to the grand jury panel in Smith's case.

– 21 –

The presiding judge began by telling the grand jurors that they were about to commence performing "an extremely important function" because, "under Alaska's Constitution, the grand jury is to determine whether there is sufficient evidence to bring a person to trial." But as my colleagues note in the lead opinion, the presiding judge then proceeded to paraphrase the grand jury's constitutional duty to "determine whether there is sufficient evidence to bring a person to trial." The judge told the grand jurors that "this provision imposes a two-fold duty upon you":

> First, grand jurors have an obligation to the people of the State of Alaska to compel persons charged with serious criminal conduct *to answer for that conduct if there are just grounds for the charge*. At the same time, however, grand jurors have an obligation to every individual to ensure that *no one is subjected to criminal prosecution without good cause*.

Bear in mind that, when the presiding judge spoke these words, the judge had just told the grand jurors that he was explaining their constitutional duty "to determine whether there is sufficient evidence to bring a person to trial." Thus, when the judge referred to cases where there are "just grounds" for the charge, and when the judge contrasted those cases with instances where an individual is subjected to criminal prosecution "without good cause", the grand jurors could reasonably interpret the judge to be saying (1) that there are "just grounds" for requiring a person to answer a felony charge if the evidence supports the charge, and (2) that a person would be subjected to prosecution "without good cause" if the evidence did not support the charge.

But in this Court's lead opinion, my colleagues suggest a broader reading of these two phrases. My colleagues assert that the concepts of "just grounds" and "good cause" imply that grand jurors are not limited to evaluating whether the evidence they have heard is sufficient to support the proposed charges. Rather, according to my

– 22 –

colleagues, the phrases "just grounds" and "good cause" imply that grand jurors are allowed to base their decisions on "fundamental concepts of justice and fairness" — considerations which go beyond the task of "simply determining whether the evidence is sufficient to establish a defendant's guilt at trial."

Having adopted this reading of the presiding judge's instruction, my colleagues assert that reasonable grand jurors would have understood the superior court to be saying that grand jurors had the power to refuse to issue an indictment if, for reasons apart from the sufficiency of the evidence, the grand jurors concluded that it would be unjust or unfair for the State to prosecute the charge. Thus, for instance, the grand jurors might refuse to issue an indictment if they personally disagreed with the law that formed the basis of the charge, or if they thought that it was unfair to enforce that law under the circumstances of the defendant's case, or if they thought that the proposed indictment violated "fundamental concepts of justice and fairness" for some other reason — so long as this reason was not directly barred by the provisions of the grand juror oath prescribed in Criminal Rule 6(e)(1).

Having interpreted the presiding judge's instruction in this manner, my colleagues then conclude that this Court need only decide one component of Smith's claims on appeal. This one component is Smith's argument that the superior court is required to *affirmatively* instruct grand jurors that they have a limited authority to engage in nullification. My colleagues hold that the superior court is *not* required to affirmatively instruct grand jurors that they can engage in nullification, so long as the court's instructions to the grand jurors do not expressly *foreclose* the possibility of nullification.

In Smith's case, the superior court's instructions to the grand jurors do not *expressly* say that grand jurors are prohibited from engaging in nullification. Indeed, as I just explained, my colleagues interpret those instructions as actually suggesting that the

grand jurors could lawfully engage in nullification. Then, based on the assumption that the grand jurors would have understood the presiding judge's instruction in this manner, my colleagues conclude that the presiding judge in Smith's case was under no duty to *affirmatively* instruct the grand jurors that they were entitled to refuse to issue an indictment even when they concluded that the evidence supported the charge.

And having reached this conclusion, my colleagues declare that this Court does not need to decide whether Alaska grand jurors *actually* have this limited right of nullification.

My colleagues reason that if, on the one hand, Alaska law *does give* grand jurors a limited right to engage in nullification (limited by the requirements of Alaska's grand juror oath), then the presiding judge's instructions to the grand jury panel in Smith's case correctly suggested that grand jury nullification was allowed. If, on the other hand, Alaska law *does not give* grand jurors a limited right to engage in nullification, then there was no harm — because, even though the grand jurors may have falsely believed that they had the discretion to refuse to indict Smith regardless of the evidence supporting the indictment, the grand jurors nevertheless indicted Smith.

The problem here is that my colleagues cannot justify their conclusion of mootness merely by asserting that one or more grand jurors might *potentially* have interpreted the phrases "just grounds" and "good cause" as authorizing the grand jurors to engage in nullification. Rather, my colleagues' finding of mootness requires this Court to declare that *any reasonable person* who heard the superior court's instructions would have concluded that, under Alaska law, grand jurors had this kind of discretion to ignore the evidence and the law.

But this is *not* the sole reasonable interpretation of the superior court's instructions to the grand jurors. Rather, I believe that my colleagues' interpretation of

– 24 –

the superior court's instructions hinges on taking the phrases "just grounds" and "good cause" out of context.

The superior court employed the phrases "just grounds" and "good cause" as part of its explanation of the grand jurors' duty under the Alaska Constitution "to determine whether there is sufficient evidence to bring a person to trial." After telling the grand jurors that this was the grand jury's constitutional function, the superior court then elaborated by saying that the grand jurors had an obligation "to compel persons charged with serious criminal conduct to answer for that conduct if there are just grounds for the charge", as well as a corresponding obligation "to ensure that no one is subjected to criminal prosecution without good cause."

Reasonable grand jurors, hearing these phrases in this context, would not necessarily think that the superior court was describing a grand jury's power of nullification. Rather, reasonable grand jurors might well understand the superior court to simply be elaborating on the grand jurors' constitutional duty to evaluate whether the evidence sufficiently supported a proposed indictment.

In other words, reading the superior court's instruction *as a whole* (which is what Alaska law requires[1]), grand jurors could reasonably understand the superior court to be saying that when the grand jurors evaluated whether a proposed charge was supported by the evidence, this was *the same thing* as evaluating whether the proposed felony charge was supported by "just grounds" or whether (on the other hand) a defendant was being subjected to prosecution "without good cause".

If at least *some* reasonable grand jurors could understand the presiding judge to be saying only this (and not to be suggesting that grand jurors have the right to

---

[1]    *See*, *e.g.*, *Kangas v. State*, 463 P.3d 189, 194 (Alaska App. 2020).

engage in nullification), then the issue of whether Alaska grand jurors *actually* have a right to engage in nullification is not moot.

For this reason, I think that this Court must address the question of whether, aside from the restrictions of the grand juror oath set forth in Criminal Rule 6(e)(1), Alaska grand jurors might have a limited discretion to refuse to issue an indictment even though they conclude that the evidence supports the indictment.

The answer to this question ultimately hinges on the understanding and intentions of the delegates who drafted the grand jury provision of Alaska's constitution.

My colleagues are correct that various courts and various legal commentators have declared that grand jurors have the discretion to decline to issue an indictment for reasons apart from the sufficiency of the evidence. But while this Court should of course examine the law of other jurisdictions and the views of respected legal commentators, the question before this Court is one of *Alaska* law. Thus, the answer to this question turns on how the delegates to our constitutional convention understood the authority and functions of the grand jury when those delegates codified a right to grand jury indictment in Article I, Section 8 of the Alaska Constitution.

As I explain more fully in this concurrence, the Alaska drafters' debate over our grand jury provision is completely silent regarding the question of grand jury "nullification". During this debate, no one mentioned the question of whether grand jurors might have the discretion to refuse to issue an indictment even when the grand jurors conclude that the evidence supports the proposed indictment.

The drafters' silence is significant for two reasons, both having to do with the context in which the delegates held their debate.

First, under the initial draft of our state constitution, Alaska was going to *abolish* the requirement of grand jury indictments in felony cases. This meant that the delegates who wanted to keep the requirement of a grand jury indictment had to ask the

convention to amend this initial draft — and, more importantly, those delegates had to articulate affirmative reasons for keeping the requirement of grand jury indictments.

But in the ensuing debate, the delegates who wanted to keep the requirement of a grand jury indictment were utterly silent regarding the possibility of grand jury nullification. None of these delegates spoke about a grand jury's potential power to refuse to issue an indictment for reasons apart from the sufficiency of the evidence to support the charges. More importantly, none of these delegates suggested that grand juries *ought to be* engaging in nullification, or that nullification was a beneficial function of the grand jury and a reason to require grand jury indictments.

Rather, during this debate, the various delegates who spoke in favor of keeping the requirement of a grand jury indictment repeatedly presented a single argument: that grand juries were needed to prevent overzealous prosecutors from pursuing felony charges when those charges were not supported by the evidence.

The utter failure of any delegate to mention grand jury "nullification" is particularly striking because, during the months leading up to and surrounding this constitutional debate, newspapers and magazines across the United States were filled with coverage of one of the most egregious modern examples of jury and grand jury nullification: the failure of a Southern trial jury and, later, a Southern grand jury to take any action against the men who openly admitted kidnapping and murdering a Black teenager, Emmet Till (because he purportedly made a sexual remark to a White woman).

Even though the Emmett Till case filled the media (or perhaps *because* it filled the media), the delegates who favored keeping the requirement of grand jury indictments never once asserted that grand juries were needed, or were beneficial, because of a grand jury's power to ignore the evidence and refuse to issue an indictment based on reasons of politics, social policy, or community sentiment.

At the same time, the delegates who wished to abolish the requirement of grand jury indictments never argued that grand jury nullification posed a potential danger to the rule of law — even though a prime instance of this danger was headline news at the time.

Rather, the delegates on both sides of the debate apparently viewed instances of grand jury nullification as aberrations — regrettable but unpreventable departures from a grand jury's proper function.

All of this brings me to my last point.

Throughout history, grand juries have, on occasion, refused to issue indictments despite significant or even overwhelming evidence that the defendant was guilty of the crime charged in the proposed indictment. The most famous (or infamous) of these instances involved grand jurors who refused to enforce a particular unpopular statute, or grand jurors who refused to enforce the criminal law against certain favored political, racial, or social groups, or grand jurors who refused to enforce the law when the victim of the crime was a member of a *disfavored* political, racial, or social group.

But as the Ninth Circuit pointed out in its *en banc* decision in *United States v. Navarro-Vargas*, 408 F.3d 1184 (9th Cir. 2005), these instances of grand jury nullification have occurred regardless of the instructions that the grand jurors received — *i.e.*, regardless of whether judges encouraged the grand jurors to flout the law (as often happened in pre-Revolutionary War America), or whether judges instructed the grand jurors that they were required to follow and enforce the law (instructions which became the norm after the Revolution was successful and the new national and state governments were formed).

This is because a grand jury's power of nullification ultimately derives from the very structure of the grand jury itself. Under our law, a grand jury's deliberations are secret, the grand jurors are insulated from civil or criminal sanctions for their decisions,

– 28 –

2775

and no government entity can overturn a grand jury's decision not to issue an indictment. History shows us that the phenomenon of grand jury nullification arises from these factors, rather than from anything that judges or prosecutors might tell grand jurors about the law governing a grand jury's decision-making. "In all of these cases, for better or for worse, it is the *structure* of the grand jury process and its *function* in our system that makes it independent." *Navarro-Vargas*, 408 F.3d at 1202 (emphasis in the original).

Just as trial jury nullification has not disappeared despite the fact that Alaska law expressly forbids trial jurors from engaging in nullification,[2] instances of grand jury nullification will occasionally occur even though the superior court does not (and, in my view, should not) tell grand jurors that they can engage in nullification.

I

*Why I agree with my colleagues that Alaska grand jurors are bound by the provisions of the grand juror oath prescribed in Criminal Rule 6(e)(1)*

Alaska Criminal Rule 6(e)(1) declares that grand jurors must take an oath before they commence their duties. In this oath, the grand jurors promise that they will "diligently inquire and true presentment make" of all the matters that come before them, that they will not "leave anyone unpresented [*i.e.*, unindicted] through fear, affection, gain, reward, or hope thereof", and that they will instead "present all things truly and impartially as [these matters] shall come to [their] knowledge according to the best of [their] understanding."

---

[2]  *Hartley v. State*, 653 P.2d 1052, 1055 (Alaska App. 1982).

The origins of this oath are more than a thousand years old, and its major provisions have been a fixture of Anglo-American law since the late 1200s.[3]

This grand juror oath was incorporated by reference in the first codification of Alaska territorial law, the Carter Code of 1900. Section 10 of Part Two of the Carter Code ("Criminal Procedure") declared that grand jury proceedings in Alaska were to be "conducted in the manner prescribed by the laws of the United States". At that time, federal law prescribed the following grand jury oath:

> You ... do swear that you will diligently inquire, and true presentment make, of such articles, matters and things as shall be given you in charge, or otherwise come to your knowledge, touching the present service. ... [Y]ou shall present no one for envy, hatred or malice; neither shall you leave any one unpresented for fear, favor, affection, hope of reward or gain, but shall present all things truly as they come to your knowledge, according to the best of your understanding. So help you God!

---

[3]  See George J. Edwards's classic treatise, *The Grand Jury* (1906), pp. 98–100:

The grand juror's oath is of great antiquity. When, in the time of Aethelred II [978 to 1016 C.E.], the twelve Thanes went out, they "swore upon the [religious] relic that was given them in hand that they would accuse no innocent man nor conceal any guilty one." In Bracton's time [the mid-1200s] the oath and pledge bound the grand jurors to similar action. ... [At] the conclusion of the reading of the *capitula* by the justices [who convened the grand jury], they [*i.e.*, the grand jurors] pledged themselves to do faithfully those things which the justices required of them, to aggrieve no one through enmity, nor defer to any one through love, and to conceal [from all persons] what they had heard [during the grand jury proceedings]. This [grand juror oath] ... contains the elements of the oath of the present day.

[By] the time of Britton [*i.e.*, about one generation later], but one oath was taken, containing all the elements of ... and more generally conforming to the oath now administered [at the turn of the 20th century].

*See Charge to Grand Jury*, 2 Sawyer 667, 30 Federal Cases 992 (D. California 1872).

In 1933, the Alaska territorial legislature made this oath an express provision of Alaska's statutory law,[4] and the oath was codified in 1933 Compiled Laws of Alaska, Section 5167:

> Sec. 5167.  **Oath of grand jury**.  Before the grand jury enter upon the discharge of their duties, the following oath shall be administered to them by the clerk of the court:
>
> You and each of you as members of this grand jury, for the United States of America and the Territory of Alaska, ... do solemnly swear that you will diligently inquire and true presentment make of all such matters and things as shall be given you in charge, or shall otherwise come to your knowledge touching this present service.  ...  That you will present no one through envy, hatred or malice, or leave anyone unpresented through fear, affection, gain, reward, or hope thereof; but that you will present all things truly and indifferently [*i.e.*, impartially] as they shall come to your knowledge according to the best of your understanding.  So help you God.

Thus, at the time of Alaska's constitutional convention, the grand juror oath that is currently found in Criminal Rule 6(e)(1) had been part of Alaska law for over half a century.  No delegate to the convention expressed any disagreement with this oath, nor any doubt as to whether Alaska grand jurors are bound by the provisions of this oath.

Following statehood, the Alaska Supreme Court re-codified this oath in Alaska Criminal Rule 6, the rule governing grand jury proceedings.

---

[4]  *See* Laws 1933, ch. 24, § 3.

The history of this oath, and its existence as part of Alaska law for more than 50 years before our state constitutional convention, is utterly inconsistent with Smith's claim that the framers of Alaska's constitution gave grand jurors an unfettered discretion to refuse to return an indictment for any reason they see fit. Rather, this history demonstrates that the delegates to our state constitutional convention (and, later, the members of our state supreme court) understood the law of Alaska as requiring grand jurors to abide by the provisions of this oath — requiring grand jurors to "diligently inquire and true presentment make" of all the matters brought before them, requiring them to "present all things truly and impartially", and requiring them to leave no one unindicted "through fear, affection, gain, reward, or hope thereof".

II

*Does any provision of Alaska's codified law give grand jurors a limited discretion to refuse to issue an indictment even when the grand jurors conclude that the evidence supports the proposed indictment?*

In Smith's briefs to this Court, he argues that two provisions of Alaska's codified law — Article I, Section 8 of our state constitution, and AS 12.40.050 — expressly grant Alaska grand jurors the discretion to decline to issue an indictment for any reason they see fit.

Smith's contention is at least partially wrong — because Alaska grand jurors are required to abide by the provisions of the oath prescribed in Criminal Rule 6(e)(1). But this leaves the question of whether, so long as Alaska grand jurors abide by the restrictions imposed by the grand juror oath, the grand jurors have a *limited* discretion to decline to issue an indictment even when they conclude that the evidence supports the proposed indictment.

For the reasons I am about to explain, I conclude that the provisions of Alaska's codified law do *not* give grand jurors the discretion to refuse to issue an indictment for reasons apart from the sufficiency of the evidence.

*(a) Smith's suggested interpretation of the fourth sentence of Article I, Section 8 of the Alaska Constitution*

Smith contends that the wording of the fourth sentence of the grand jury provision of our state constitution (Article I, Section 8) expressly grants Alaska grand jurors the discretion to decline to issue an indictment for any reason they see fit. But Smith's argument hinges on a misinterpretation of the language of this sentence.

The complete text of Article I, Section 8 is found in this footnote,[5] but Smith's argument is based on the fourth sentence of Section 8: "The grand jury shall consist of at least twelve citizens, a majority of whom concurring may return an indictment."

Smith notes that this sentence says that a majority of the grand jurors "may return an indictment", rather than "shall return an indictment". Based on the fact that this sentence uses the word "may" instead of the word "shall", Smith argues that the framers of Alaska's constitution must have intended for the grand jury's power of indictment to be discretionary — and that this fourth sentence of Article I, Section 8

---

[5]   Article I, Section 8 of the Alaska Constitution declares:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the armed forces in time of war or public danger.  Indictment may be waived by the accused.  In that case[,] the prosecution shall be by information.  The grand jury shall consist of at least twelve citizens, a majority of whom concurring may return an indictment.  The power of grand juries to investigate and make recommendations concerning the public welfare or safety shall never be suspended.

codifies the principle that grand jurors in Alaska have no legal duty to return an indictment even when they conclude that the evidence supports the charge against the defendant.

In *State v. Leighton*, 336 P.3d 713, 715 (Alaska App. 2014), this Court rejected this proposed reading of Article I, Section 8. However, *Leighton*'s discussion of this point is short and conclusory. Here is how I would now explain the result in *Leighton*, and why I reject Smith's proposed interpretation of Article I, Section 8.

Smith's argument hinges on the ambiguity of the verb "may".

In some contexts, the verb "may" can mean "might or might not" — for example, "It may rain this afternoon." or "We may get our work done by mid-afternoon." The verb "may" can also have a similar meaning — "might or might not" — when we speak of people's potential decisions. For example, the sentence "Constance may take a coffee break before she begins work on her next project" can potentially mean that Constance might choose to take a coffee break before beginning her next project, or she might choose to begin her next project immediately.

But the verb "may" can also mean "is authorized to" or "is permitted to". When a parent tells a babysitter, "The children may have a cookie after they have finished their soup and toast", the parent is *not* describing the children's potential future decision about eating cookies after their meal. Rather, the parent is informing the babysitter of a *rule*: The children are permitted to have a cookie only after they have finished their soup and toast.

Similarly, when the managing partner of a law firm tells one of the firm's other lawyers, "You may select one of our junior associates to work full-time with you on your case", the managing partner is *giving authorization* to the other lawyer — permission to select a junior associate to work on the lawyer's case, to the exclusion of all other potential demands on the associate's time.

Indeed, it now can be seen that my earlier example — "Constance may take a coffee break before she begins work on her next project" — is ambiguous. Its meaning depends on who is uttering these words, and in what context. If this sentence is spoken by a workplace supervisor, the sentence might mean that the supervisor is giving *permission* for Constance to take a break before beginning her next project. On the other hand, if these words are spoken by a friend, co-worker, or subordinate, the sentence can simply mean that Constance might or might not decide (at her option) to take a break before she commences her next project.

Thus, the meaning of the word "may" in a sentence often cannot be understood until one has considered the context in which the word is used.

Smith concedes that the minutes of Alaska's Constitutional Convention do not contain any discussion of why the framers wrote "may return an indictment" rather than "shall return an indictment" in Article I, Section 8. But the wording of this fourth sentence, considered as a whole, shows that the word "may" is employed in the sense of authorization: a grand jury is authorized to return an indictment if a majority of the grand jurors concur.

This conclusion — that Article I, Section 8 uses the word "may" in the sense of "is authorized to" — is bolstered by the pre-statehood provisions of Alaska law dealing with the grand jury.

From Alaska's earliest days under United States governance, Alaska law (first federal, and then Alaska territorial law) contained many provisions governing the procedures and actions of the grand jury. The earliest versions of these provisions are found in the Carter Code of 1900. [6]

---

[6] Many provisions of the Carter Code are direct forerunners of provisions now found in Alaska Criminal Rule 6: the power of the grand jury foreperson to administer oaths, the

(continued...)

For present purposes, the most relevant provision of the Carter Code was Part Two, Section 29. This provision prescribed the minimum number of grand juror votes required to support an indictment, and this provision was carried forward in all subsequent codifications of Alaska law, up until statehood: [7]

> Sec. 29. **The indictment must be found by twelve jurors and indorsed by foreman**. That an indictment can not be found without the concurrence of at least twelve grand jurors; and when so found it must be indorsed "a true bill," and such indorsement signed by the foreman of the jury.

The Carter Code itself did not contain any provision specifying the size of the grand jury, but the Carter Code specified (in Section 10 of Part Two) that grand jury proceedings in Alaska were to be "conducted in the manner prescribed by the laws of the United States". And at that time (1900), federal law specified that grand juries had to

---

[6] (...continued)
secrecy of grand jury proceedings, the limitations on who may be present during the sessions of the grand jury, the power of the grand jury to seek guidance from the superior court as to whether particular facts constitute a crime, or whether there is some legal bar to the proposed prosecution of the defendant, the power of the grand jury to call for the presentation of potentially exculpatory evidence, and the legal effect of the grand jury's decision that a proposed indictment is "a true bill" or "not a true bill".

Compare Criminal Rule 6(h) with Part Two, Section 17 of the Carter Code; Criminal Rule 6(l) with Part Two, Sections 28 and 32 of the Carter Code; Criminal Rule 6(k) with Part Two, Section 25 of the Carter Code; Criminal Rule 6(o) with Part Two, Sections 15 and 16 of the Carter Code; Criminal Rule 6(q) with Part Two, Section 18 of the Carter Code; and Criminal Rule 6(n) with Part Two, Sections 31, 33, and 34 of the Carter Code.

[7] See Section 2138 of CLA 1913, Section 5196 of CLA 1933, and Section 66-8-51 of ACLA 1949.

consist of at least sixteen grand jurors and no more than twenty-three.[8] Later, in 1933, the Alaska territorial legislature codified this same requirement.[9]

Thus, when the pre-statehood law of Alaska specified that at least twelve grand jurors had to concur in any indictment, this meant that even if the grand jury was at its maximum size of twenty-three members, an indictment required the concurrence of a majority of the grand jurors.

This historical context explains the fourth sentence of Article I, Section 8 of our state constitution: "The grand jury shall consist of at least twelve citizens, a majority of whom concurring may return an indictment." This constitutional provision was intended to cover the same two subjects as the pre-statehood law that I have just discussed. These subjects were (1) the mandated size of grand jury panels, and (2) the number of grand juror votes needed to support an indictment.

Article I, Section 8 significantly relaxed the pre-statehood requirements — because, under this constitutional provision, grand juries can consist of as few as twelve people, and indictments only need the concurrence of a majority of the grand jurors, even when that majority is as small as seven grand jurors.

But more importantly, this history shows that Smith is wrong when he argues that the phrase "a majority of whom concurring may return an indictment" was intended to codify the notion that grand jurors had the discretion to refuse to indict someone, no matter how much evidence supported the charge. Rather, the purpose of

---

[8]  See Revised Statutes of the United States (the predecessor to the United States Code), Title XIII ("The Judiciary"), chapter 15, Section 808: "Every grand jury empaneled before any district or circuit court shall consist of not less than sixteen nor more than twenty-three persons."

[9]  See Laws 1933, ch. 24, § 2. This provision was codified as Section 5166, CLA 1933, and it was carried forward as Section 66-8-2 of ACLA 1949.

this fourth sentence of Article I, Section 8 is to prescribe the required size of grand jury panels and the number of grand jurors needed to support an indictment.

None of Alaska's pre-statehood grand jury statutes spoke of, or even suggested, an unbounded grand jury discretion to refuse to issue an indictment regardless of the strength of the evidence supporting that indictment. To the contrary: Alaska's pre-statehood statutes spoke of a grand jury's *duty* to return an indictment when the evidence warranted it.

Part Two, Section 19 of the Carter Code declared, "That the grand jury ought to find an indictment when all the evidence before them, taken together, is such as in their judgment would, if unexplained or uncontradicted, warrant a conviction by the trial jury." This provision was carried forward in the codification of 1913 (Section 2128), and then in the codification of 1933 (Section 5183), and then again in the final pre-statehood codification of 1949 (Section 66-8-27).

The framers of our state constitution were presumably aware that, ever since the Carter Code of 1900, Alaska law had spoken in terms of a grand jury's *duty* to return an indictment if it was supported by the evidence — that grand jurors "ought to find an indictment" if the grand jurors concluded that the evidence, if "taken together, ... would, if unexplained or uncontradicted, warrant a conviction by the trial jury." And no delegate voiced any objection to the precept codified in these pre-statehood statutes.

(I provide a more detailed analysis of the phrase "would warrant a conviction" a little later in this section, when I discuss the language of Alaska Criminal Rule 6(r).)

Because Article I, Section 8 of our state constitution was formulated and adopted in this legal and historical context, I join my colleagues in rejecting Smith's contention that the fourth sentence of Article I, Section 8 was meant to confer unbounded discretion on grand jurors to refuse to return an indictment for any reason.

– 38 – 2775

(Smith also presents a separate argument concerning Article I, Section 8. Smith contends that even if the text of Article I, Section 8 does not *expressly* confer discretion on grand jurors to refuse to return an indictment for reasons apart from the sufficiency of the evidence, Article I, Section 8 *impliedly* confers this kind of discretion on grand jurors. I address this argument later in my concurrence — and I explain why Smith's argument is inconsistent with the content of the delegates' debate regarding Article I, Section 8.)

### (b) Smith's suggested interpretation of AS 12.40.050

Smith also argues that AS 12.40.050 (one of a series of statutes governing Alaska grand juries) codifies the principle that grand jurors have unbridled discretion to decline to issue an indictment even when the grand jurors conclude that the evidence supports the proposed indictment. Smith bases his argument on the fact that AS 12.40.-050 says, "The grand jury *may* indict or present a person for a crime upon sufficient evidence ...".

But Smith's argument is based on a misquotation of AS 12.40.050. When Smith quotes this statute in his brief, he puts a period after the word "evidence", as if that were the end of the sentence. But in the statute itself, there is a *comma* after the word "evidence", and the sentence continues with another clause. Here is the complete text of AS 12.40.050:

> **Holding to answer as affecting indictment or presentment.** The grand jury may indict or present a person for a crime upon sufficient evidence, whether that person has been held to answer for the crime or not.

When AS 12.40.050 is read as a whole, it is clear that this statute uses the word "may" in the sense of "is authorized to". The statute authorizes a grand jury to indict a defendant regardless of whether the defendant has previously been "held to answer" — *i.e.*, regardless of whether the grand jury's indictment will be the first public charge filed against the defendant or whether, instead, the defendant has already been charged with the crime by complaint or by information, and the defendant has been "held to answer" by the district court (*i.e.*, either committed to jail or released on bail to await the action of the grand jury).

This provision of Alaska law, authorizing a grand jury to indict a person regardless of whether a court has already ordered that person to be "held to answer", has been part of Alaska law ever since the Carter Code of 1900. See Carter Code, Part Two, Section 14. [10] This history removes any potential ambiguity in the wording of AS 12.40.-050, and it shows that Smith's suggested reading of this statute is mistaken.

(I note, with some chagrin, that this Court's reading of AS 12.40.050 in *State v. Leighton*, 336 P.3d 713 (Alaska App. 2014), is only partially correct. In *Leighton*, 336 P.3d at 716, this Court declared that AS 12.40.050 authorizes a grand jury "to return an indictment on charges that the State has not proposed, if the evidence justifies the charges." That characterization of the statute is correct, as far as it goes, but it fails to describe the full scope of the statute.

AS 12.40.050 addresses a grand jury's authority to issue an indictment regardless of whether the defendant has already been *held to answer*. The category of cases where a defendant has not previously been held to answer does, in fact, include instances where the State has not proposed any felony charge against the defendant but

---

[10] "Section 14. **May indict whether defendant has been held to answer or not**. That the grand jury may indict or present a person for a crime, upon sufficient evidence, whether such person has been held to answer for such crime or not."

the grand jury concludes that one or more felony charges should be prosecuted. However, this category of cases also covers instances where the State chooses to present its proposed felony charges directly to the grand jury in the first instance, without first filing an information or a complaint against the defendant.)

### (c)  The language of Alaska Criminal Rule 6(r): "would warrant a conviction of the defendant"

As I have already discussed, Alaska's pre-statehood statutes spoke of a grand jury's duty to return an indictment when the evidence warranted it. Part Two, Section 19 of the Carter Code declared, "That the grand jury ought to find an indictment when all the evidence before them, taken together, is such as in their judgment would, if unexplained or uncontradicted, warrant a conviction by the trial jury." This provision was carried forward in the codification of 1913 (Section 2128), then in the codification of 1933 (Section 5183), and then again in the final pre-statehood codification of 1949 (Section 66-8-27).

This duty is now codified in Alaska Criminal Rule 6(r). In fact, Rule 6(r) words this duty even more emphatically: "The grand jury *shall find an indictment* when all the evidence taken together, if unexplained or uncontradicted, would warrant a conviction of the defendant."

The phrase "would warrant a conviction of the defendant" might potentially imply a broad standard that leaves room for grand jurors to exercise some discretion even when they conclude that the evidence supports the proposed indictment. But this phrase means something quite different in Criminal Rule 6(r).

As this Court recognized in *Sheldon v. State*, 796 P.2d 831, 836–37 (Alaska App. 1990), the wording of Rule 6(r) was taken from Section 66-8-27, ACLA 1949 —

wording that has come down, essentially unchanged, from the Carter Code of 1900. This pre-statehood statute read:

> **Sufficiency of evidence to warrant indictment.** That the grand jury ought to find an indictment when all the evidence before them, taken together, is such as in their judgment would, if unexplained or uncontradicted, warrant a conviction by the trial jury.

As we discussed in *Sheldon*, the Alaska Supreme Court has frequently quoted the sufficiency-of-the-evidence standard set forth in Criminal Rule 6(r), and the supreme court has consistently indicated, under this test, grand jury proceedings are not a "mini trial". Rather, a grand jury should return an indictment when the grand jurors are convinced of the probability of the defendant's guilt. [11]

The pre-statehood statute explicitly identified the *trial jurors* as the people who would determine whether the defendant should be convicted — and there is no indication that the language of Rule 6(r) was intended to mean anything different. In fact, the Alaska Supreme Court has repeatedly held that Rule 6(r) embodies the same test as the pre-statehood statute. See *Lupro v. State*, 603 P.2d 468, 473 (Alaska 1979), *Newsom v. State*, 533 P.2d 904, 906 (Alaska 1975), and *Taggard v. State*, 500 P.2d 238, 242–43 (Alaska 1972) — all declaring that, under Rule 6(r), the test for determining whether the evidence presented to the grand jury is sufficient to support an indictment

---

[11] *See, e.g.*, *Preston v. State*, 615 P.2d 594, 602 (Alaska 1980); *State v. Gieffels*, 554 P.2d 460, 465 (Alaska 1976); *Coleman v. State*, 553 P.2d 40, 48 (Alaska 1976); *Taggard v. State*, 500 P.2d 238, 242 (Alaska 1972); *Burkholder v. State*, 491 P.2d 754, 758 (Alaska 1971).

In *Adams v. State*, 598 P.2d 503, 508 (Alaska 1979), the supreme court referred to the test as requiring the State to present a "prima facie case" of the defendant's guilt, but it does not seem that the supreme court meant anything different from the "probability of guilt" standard that the court had discussed in its other cases.

is whether that evidence, if unexplained or uncontradicted, "would warrant a conviction of the person charged with an offense *by the judge or jury trying the offense*." (Emphasis added.)

Thus, under Criminal Rule 6(r), the grand jurors' task is to decide whether the evidence they have heard would "warrant" (*i.e.*, justify) a finding of guilt by the trier of fact at the defendant's later criminal trial. (See *Sheldon*, 796 P.2d at 837, declaring that Criminal Rule 6(r) uses the word "warrant" in the sense of "justify".)

This point is crucial: Criminal Rule 6(r) does not direct grand jurors to decide whether *they personally* think the defendant should be convicted of the charged crime. Rather, Rule 6(r) requires grand jurors to decide whether, if the evidence they have heard is later presented to an impartial trier of fact at trial, this evidence would warrant the trial jury or trial judge in concluding that the defendant was guilty of the charged crime.

Both trial juries and trial judges are required by law to be impartial, and they are required to apply the law regardless of their personal views or preferences. [12]

Thus, under Criminal Rule 6(r), grand jurors must decide whether the evidence they have heard would justify a trier of fact in later finding the defendant guilty at trial when that trier of fact is *legally barred* from exercising discretion based on personal doubts about the wisdom of the applicable law or about whether (apart from insufficiency of the evidence) the authorities acted in the best interest of society when they decided to pursue the charge.

This Court emphasized this point in *Hohman v. State*, 669 P.2d 1316 (Alaska App. 1983). The defendant in *Hohman* challenged his indictment because the grand jurors were instructed:

---

[12] *See Hartley v. State*, 653 P.2d 1052, 1055 (Alaska App. 1982).

[Y]ou are admonished that you are not to undertake to determine [the defendant's] guilt or innocence. That is the exclusive function of the trial jury. Your duty ... is to determine whether there is probable cause to believe that an accused person is guilty of the offense charged. Your duty in each case is merely to determine whether the evidence is such as would, if unexplained or uncontradicted, warrant a conviction by the trial jury, and leave the determination of guilt, or innocence, to that body.

*Hohman*, 669 P.2d at 1320. This Court held that the language of this instruction accurately embodied the test and the mandate of Criminal Rule 6(r). *Id.*

To sum up this statutory history and case law: When Criminal Rule 6(r) declares that grand jurors must decide whether the evidence they have heard "would warrant a conviction of the defendant", Rule 6(r) is not telling grand jurors to decide whether *they personally* would convict the defendant. Nor is Rule 6(r) declaring (or even implying) that grand jurors have a discretionary power to decline to issue an indictment for reasons unrelated to the strength of the government's evidence.

Instead, Alaska cases on this subject repeatedly (and uniformly) hold that, under Rule 6(r), the grand jurors' task is to decide whether the evidence is sufficient to later justify *someone else — i.e.*, a group of impartial trial jurors who are required to follow the law — in finding the defendant guilty.

# III

*Do any of the Alaska Supreme Court's past decisions recognize a limited discretion on the part of grand jurors to refuse to issue an indictment even when the grand jurors conclude that the evidence supports the proposed indictment?*

Beginning with its 1962 decision in *State v. Shelton*, 368 P.2d 817 (Alaska 1962), the Alaska Supreme Court has issued nine decisions in which the court declared that a "vital function" of the grand jury is "the protection of the innocent against oppression and unjust prosecution." *Shelton*, 368 P.2d at 819. The supreme court has quoted, cited, or otherwise relied on this language from *Shelton* in eight later cases. [13]

Taken in isolation, the phrase "protection ... against oppression and unjust prosecution" might suggest that grand jurors have the authority to refuse to issue an indictment for reasons other than a lack of evidence. But in each instance where the supreme court has used this language (beginning with the *Shelton* decision itself), the court has invariably stated that the grand jury's function is "the protection *of the innocent* against oppression and unjust prosecution."

Thus, *Shelton* and the eight later decisions that rely on *Shelton* do not stand for the proposition that grand jurors in Alaska have the discretion to refuse to issue an

---

[13] The supreme court *directly* cited or quoted this passage from *Shelton* in *State v. Parks*, 437 P.2d 642, 643 (Alaska 1968), *Doe v. State*, 487 P.2d 47, 54 (Alaska 1971), *Burkholder v. State*, 491 P.2d 754, 757 (Alaska 1971), *Coger v. State*, 517 P.2d 1403, 1405 n. 4 (Alaska 1974), and *Adams v. State*, 598 P.2d 503, 510 n. 11 (Alaska 1979).

The supreme court repeated this language from *Shelton*, but without explicit citation, in *State v. Gieffels*, 554 P.2d 460, 464 (Alaska 1976). The supreme court later cited this portion of the *Gieffels* decision in *Frink v. State*, 597 P.2d 154, 165 (Alaska 1979). Still later, in *Cameron v. State*, 171 P.3d 1154, 1156 (Alaska 2007), the supreme court cited this portion of *Frink*, but without explaining that the language of *Frink* was based on what the court had originally said forty-five years earlier in *Shelton*.

indictment whenever the grand jurors conclude that the proposed charges, although supported by the evidence, are nevertheless "unjust" in some respect.

Rather, in *Shelton* and these eight later cases, the supreme court has declared that a vital function of the grand jury is to protect innocent people from having to face trial on unfounded accusations.

See *Adams v. State*, 598 P.2d 503, 510 n. 11 (Alaska 1979), where the supreme court explained:

> [T]he purpose served by grand jury indictment is to give one accused of a serious offense the benefit of having private citizens judge *whether there is probable cause to hold the accused for trial*. The grand jury protects the innocent from unjust prosecution by acting as a check on the prosecutor. [Citing *Doe v. State*, 487 P.2d 47, 54 (Alaska 1971), and *State v. Shelton*, 368 P.2d 817, 819 (Alaska 1962).] (Emphasis added.)

Thus, according to *Adams*, the grand jury fulfills its function of protecting "the innocent from unjust prosecution" when the grand jurors assess the sufficiency of the evidence to support the proposed charges under the test set forth in Criminal Rule 6(r).

I now turn to one other case where our supreme court has discussed the function of the grand jury.

In *Wassillie v. State*, 411 P.3d 595 (Alaska 2018), the supreme court stated that the grand jury has *two* functions: it "protects against the danger that a defendant will be required to defend against a charge for which there is no probable cause to believe him guilty", and it also "serves the invaluable function ... of standing between the accuser and the accused to determine whether a charge is founded upon reason or [is] dictated by an intimidating power or by malice and personal ill will." *Wassillie*, 411 P.3d at 607–08.

As authority for the assertion that a grand jury has these separate functions, our supreme court cited (and quoted from) just one source: Justice O'Connor's concurring opinion in *United States v. Mechanik*, 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d. 50 (1986). Here is the relevant passage from Justice O'Connor's concurrence in *Mechanik*:

> The grand jury has two principal functions. First, it bears the weighty responsibility of investigating crime and determining whether there is probable cause to believe that a crime has been committed. [citations omitted] The second, and no less important, task of the grand jury is to "serv[e] the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group, or other, to determine whether a charge is founded upon reason or dictated by an intimidating power or by malice and personal ill will." *Wood v. Georgia*, 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962).

*Mechanik*, 475 U.S. at 73–74, 106 S.Ct. at 943.

The problem here is that, in her concurrence, Justice O'Connor is not quoting a *holding* that the U.S. Supreme Court reached in *Wood v. Georgia*. Rather, Justice O'Connor is quoting dictum from *Wood v. Georgia* — and Justice O'Connor is mischaracterizing this dictum.

The Supreme Court in *Wood* did not assert, or even imply, that a grand jury has the two separate functions that Justice O'Connor describes in her concurrence. Rather, the *Wood* opinion says that a grand jury has *one* function: to assess whether a proposed criminal charge is adequately supported by the evidence *or is instead* "dictated by an intimidating power or by malice and personal ill will." [14]

---

[14] *Wood v. Georgia*, 370 U.S. 375, 370; 82 S.Ct. 1364, 1373.

The meaning of this passage from *Wood* is clarified by examining the context in which this passage originated — the facts and issues presented to the U.S. Supreme Court in *Wood v. Georgia*, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569, 8 L.Ed.2d 569 (1962).

The controversy in *Wood* arose out of the civil rights movement of the late 1950s and early 1960s, and from a group of superior court judges' political opposition to that movement.

As explained by the U.S. Supreme Court, one of the superior court judges of Bibb County, Georgia (acting on behalf of all three superior court judges of that county [15]) convened the local grand jury and specially instructed the grand jurors to conduct an investigation into a potentially criminal situation which (the judge asserted) had arisen in their county. [16]

The judge told the grand jurors that there appeared to be an "inexplicable pattern of Negro bloc voting" in Bibb County — and that, according to "rumors and accusations" which had come to the superior court's attention, certain candidates for public office had paid large sums of money to obtain the Black vote. The judge further alleged that certain Black leaders, after having met and endorsed one candidate, later switched their support to an opposing candidate who had put up a large sum of money — and that this "create[d] an unhealthy, dangerous, and unlawful situation" which "tend[ed] to corrupt public office holders and some candidates for public office." [17]

The judge listed various criminal statutes which he claimed would be violated if the grand jurors concluded that these accusations were well-founded, and the

---

[15]  *Wood*, 370 U.S. at 381, n. 3; 82 S.Ct. at 1368, n. 3.

[16]  *Id.*, 370 U.S. at 376, 82 S.Ct. at 1365.

[17]  *Id.*, 370 U.S. at 376, 82 S.Ct. at 1365–66.

judge gave the grand jurors a list of specific questions which they should answer when (as directed by the judge) they conducted their inquiry into these potential election law violations. [18]

The judge issued these instructions to the grand jury in the midst of a local political campaign — and, to publicize the fact that he was ordering the grand jury to commence this investigation, the judge requested reporters from all the local news media to be present in court when the judge delivered his instructions to the grand jurors. [19]

The following day (while the grand jury was in session investigating the matters that the judge had directed them to investigate), the local sheriff, James Wood, issued a statement to the press in which he criticized the three judges' action.

Sheriff Wood urged the citizens of Bibb County to take notice that their highest judicial officers were engaging in political intimidation and persecution of Black voters under the guise of law enforcement. [20] The sheriff characterized the superior court's instructions to the grand jury as mirroring "the style and language of a race-baiting candidate for political office", and he called the judges' action "one of the most deplorable examples of race agitation to come out of Middle Georgia in recent years". [21]

Sheriff Wood predicted that the Black community of Bibb County "[would] find little difference in principle between [this] attempted intimidation of their people by judicial summons and inquiry" and the kinds of violent intimidation practiced

---

[18] *Id.*, 370 U.S. at 376–77, 82 S.Ct. at 1366.

[19] *Id.*, 370 U.S. at 378–79, 82 S.Ct. at 1366–67.

[20] *Id.*, 370 U.S. at 379–380, 82 S.Ct. at 1367.

[21] *Ibid.*

by the Ku Klux Klan. [22] The sheriff declared that the three superior court judges were "employing a practice [that was] far more dangerous to free elections than anything they want investigated", and the sheriff expressed his hope that the grand jury "[would] not let [itself] be a party to any political attempt to intimidate the [Black people] in this community." [23]

The following day, Sheriff Wood delivered an "Open Letter to the Bibb County Grand Jury". In this letter, the sheriff suggested that the superior court judges' allegation of vote-buying was false — and that, in the sheriff's opinion, the grand jury should instead be investigating the Bibb County Democratic Party Executive Committee for corruptly purchasing votes. [24]

Based on the sheriff's public statements, the Bibb County Superior Court charged Sheriff Wood with criminal contempt. The court alleged that the language the sheriff had used was calculated to be contemptuous of the court, to ridicule the grand jury investigation ordered by the court, and "to hamper, hinder, ... and obstruct" the grand jury in its investigation. [25]

At the hearing on these charges, the Bibb County superior court found Sheriff Wood guilty. The court made no findings to support its verdicts other than the fact that the sheriff had made these public statements. [26]

The U.S. Supreme Court granted Sheriff Wood's petition for writ of certiorari and reversed his convictions on the ground that the First Amendment protects

---

[22] *Ibid.*

[23] *Ibid.*

[24] *Id.*, 370 U.S. at 380, 82 S.Ct. at 1367–68.

[25] *Id.*, 370 U.S. at 380–81, 82 S.Ct. at 1367–68.

[26] *Id.*, 370 U.S. at 382, 82 S.Ct. at 1369.

citizens from being held in contempt for out-of-court statements unless, given the circumstances, the person's statements created a clear and present danger of an imminent and serious threat to the fair administration of the judicial process. [27]

In reaching its conclusion that Sheriff Wood's statements were protected by the First Amendment (thus prohibiting the Bibb County superior court from punishing the sheriff for these statements), the U.S. Supreme Court wrote — in *obiter dictum* — about the role that the grand jury plays in the federal system, and why it is important that citizens be able to make public statements about matters pending before the grand jury:

> Historically, [the grand jury] has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused, [no matter whom], *to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will*.

*Wood*, 370 U.S. at 390, 82 S.Ct. at 1373. (Emphasis added)

Given the wording of this passage, and given the factual context presented in *Wood*, it is clear that the *Wood* opinion is describing a single grand jury function — the grand jurors' task of deciding whether a proposed criminal charge is sufficiently supported by the evidence to warrant a trial. In performing this function, grand jurors might conclude *either* that the charge "is founded upon reason" *or* that the charge has been put forward "by an intimidating power" or out of "malice and personal ill will" — in other words, the charge is *not* well-founded.

Moreover, this passage from *Wood* is dictum — because the Supreme Court was describing the function of a *state* grand jury.

---

[27] *Id.*, 370 U.S. at 383–84, 386–387, & 389; 82 S.Ct. at 1369–1372.

The Fifth Amendment's guarantee of the right to grand jury indictment in felony cases does not apply to the states. [28] This being so, the United States Supreme Court has no authority to prescribe the functions of state grand juries such as the Georgia grand jury involved in *Wood*. Rather, the Supreme Court was broadly characterizing the traditional function of grand juries in general — not as a holding, but as dictum.

Thus, in *Wassillie v. State*, when the Alaska Supreme Court cited Justice O'Connor's concurring opinion in *Mechanik*, the Alaska Supreme Court was citing a mischaracterization of dictum from *Wood v. Georgia*.

Justice O'Connor's concurrence in *Mechanik* is the sole legal authority that the Alaska Supreme Court cited in *Wassillie* when the supreme court made *its own* assertion about a grand jury's having two separate functions. As a result, the *Wassillie* opinion does not contain any valid legal authority to support this assertion.

I add one final observation about *Wassillie*: Even if Justice O'Connor's concurrence *had been* a valid characterization of federal grand jury law, this would not be binding authority on the question presented in this appeal — because the question presented here is one of *Alaska* law.

Here, Smith asserts that Alaska grand jurors have the authority to refuse to issue an indictment for any reason they see fit, even after the grand jurors have concluded that the evidence supporting the proposed charge is sufficient, under the test set forth in Alaska Criminal Rule 6(r), to require the defendant to stand trial.

This Court has already answered this question in part, by holding that grand jurors are bound by the provisions of the grand juror oath prescribed in Criminal Rule 6(e)(1). But this still leaves the question of whether, apart from the restrictions imposed by the grand juror oath, Alaska grand jurors have a limited discretion to refuse

---

[28]  *Hurtado v. California*, 110 U.S. 516, 538; 4 S.Ct. 111, 122; 28 L.Ed. 232 (1884).

to issue an indictment even when they conclude that the proposed charge is supported by the evidence.

Because the federal grand jury requirement does not apply to the states, the answer to this question hinges on the intent of the drafters of *Alaska's constitution* — specifically, the role that these drafters envisioned for the grand jury under Article I, Section 8 of our state constitution. Regardless of whatever authority federal grand jurors might have, it is this Court's duty to ascertain and follow Alaska law on this subject.

As I explain later in this concurrence, I conclude (from the record of the proceedings at our state constitutional convention) that the drafters of Alaska's constitution did *not* envision that grand jurors would have the authority to refuse to issue an indictment for any reason they pleased.

This same observation (that the question presented here is one of *Alaska law* rather than federal law) applies to the dissenting opinion of Justices Matthews and Eastaugh in *State v. Markgraf*, 913 P.2d 487, 487 (Alaska 1996). In that dissent, the two justices rely on federal authority — the U.S. Supreme Court's decision in *Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) — for the proposition that grand jurors have the discretion to return a lesser charge, or to refuse to issue any indictment at all, even when they conclude that the evidence supports the proposed charge. But *Vasquez v. Hillery* is not valid authority for this proposition.

*Vasquez* involved a murder prosecution under *state* law: the defendant, Hillery, had been convicted of murder in California, and he alleged that the indictment against him was constitutionally infirm because Black people had been systematically excluded from the grand jury.[29] When Hillery's case reached the Supreme Court, one of the arguments made by the State of California was that, even if the selection of the

---

[29] *Vasquez v. Hillery*, 474 U.S. at 255–56; 106 S.Ct. at 619.

grand jurors had been marred by racial discrimination, this would be harmless error —because Hillery had received a fair trial, and because the evidence against him was overwhelming. [30]

The Supreme Court rejected the State of California's argument. First, the Court noted that it had already issued a series of decisions rejecting the notion that a criminal conviction might be allowed to stand despite racial discrimination in the selection of the grand jury. [31] But then the Supreme Court added that, even if the defendant had received a fair trial, it was impossible to tell whether unlawful racial discrimination might have affected the grand jury's decision to indict the defendant in the first place:

> [We are not] persuaded that discrimination in the grand jury has no effect on the fairness of the criminal trials that result from that grand jury's actions. The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a noncapital offense — all on the basis of the same facts. Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be obtained." *United States v. Ciambrone*, 601 F.2d 616, 629 ([2nd Cir.] 1979) (Friendly, J., dissenting). Thus, even if a grand jury's determination of

---

[30]   *Vasquez*, 474 U.S. at 260, 106 S.Ct. at 622.

[31]   *Id.*, 474 U.S. at 260–62, 106 S.Ct. at 622–23. See, in particular, *Rose v. Mitchell*, 443 U.S. 545, 556; 99 S.Ct. 2993, 3000; 61 L.Ed.2d 739 (1979), declaring that discrimination on the basis of race in the selection of grand jurors "strikes at the fundamental values of our judicial system and our society as a whole", and that a criminal defendant's right to equal protection of the laws is denied when the defendant is indicted by a grand jury from which members of a racial group have been purposefully excluded.

probable cause is confirmed in hindsight by a conviction on the indicted offense, that confirmation in no way suggests that the discrimination did not impermissibly infect the framing of the indictment and, consequently, the nature or very existence of the proceedings to come.

*Vasquez*, 474 U.S. at 263, 106 S.Ct. at 623.

It is important to note, when construing this passage from *Vasquez*, that the Supreme Court does not cite any *California* law to support its description of a California grand jury's discretionary authority. The only law cited by the Supreme Court is the dissenting opinion in a Second Circuit case, *United States v. Ciambrone*.

As I have already explained, the federal courts have no power to dictate the functions or authority of state grand juries. Thus, in *Vasquez*, the Supreme Court is not announcing or proclaiming the authority of a California grand jury. Rather, the Supreme Court appears to have simply *assumed* that California grand juries had the discretionary authority to refuse to issue an indictment, or to indict the defendant only on a lesser charge, even when the grand jurors concluded that the evidence supported the proposed charge.

Ironically, the Supreme Court made this assumption about a California grand jury's discretion so that the Court could then *limit* this assumed discretion — by declaring that it is unconstitutional (under the federal constitution) for a state grand jury to exercise this kind of discretion when the grand jury's decision is motivated or influenced by racial discrimination.

But in any event, this passage from *Vasquez v. Hillery* is not authority for the proposition that grand jurors in Alaska have the discretion to refuse to issue an indictment even when they have concluded that the evidence supports the proposed charge.

## IV

*Smith's alternative argument, based on the history of the grand jury in America and on the debate at Alaska's constitutional convention, that Article I, Section 8 should be interpreted as endowing grand juries with a right of nullification*

Smith argues that grand juries in England and America have traditionally exercised a power of nullification — the power to refuse to issue indictments for political, social, or personal reasons, apart from whether the evidence is sufficient to support the proposed charge. Smith further contends that grand juries have always been *encouraged and expected* to exercise this power of nullification — to act as the "conscience of the community" by refusing to return indictments if the grand jurors disputed the wisdom of the criminal laws they were being asked to enforce, or if the grand jurors disagreed with the application of those laws to particular defendants, or if the grand jurors felt that the particular victims of the crime did not merit the protection of the law.

Smith further argues that Article I, Section 8 of the Alaska Constitution implicitly incorporates this view of the proper function of the grand jury. He contends that when the delegates to Alaska's constitutional convention drafted Article I, Section 8 (the provision that guarantees felony defendants the right to grand jury indictment), those delegates were working under the assumption that Alaska grand juries had a right of nullification, and that this was an essential component of the grand jury's function.

Based on his interpretation of Article I, Section 8, Smith argues that it is unconstitutional for a court to instruct grand jurors that they have any duty to return an indictment, even when the grand jurors conclude that the evidence supports the charge. In fact, Smith argues that our constitution requires courts to affirmatively instruct grand

jurors that they are under *no duty* to return an indictment, even when the evidence supports the charge — and that, instead, grand jurors have a right to *refuse* to return an indictment if they disagree with the law or with the law's application to the case before them.

Smith is correct that, over the past three centuries, American grand juries have sometimes refused to return indictments even though the law and the evidence apparently supported the charges. The most notable of these instances of nullification occurred when grand jurors sympathized with the political or social aims of the persons accused.

But the question here is not whether grand jurors have sometimes willfully ignored the law or willfully refused to enforce it. Rather, the question is whether the drafters of Article I, Section 8 of the Alaska Constitution considered this behavior to be an essential component of what grand jurors *should* be doing.

For the reasons I explain in this section of my concurrence, I conclude that the drafters of Article I, Section 8 did not intend to codify the right of nullification that Smith proposes. The framers of our state constitution did not presume that grand jurors had a right of nullification, nor did the framers view nullification as an essential component of the grand jury's function.

If any of the delegates had thought that grand juries should engage in nullification, and that society was better off because of it, they never spoke up — and they certainly had reason to speak up, given the fact that the initial draft of our state constitution *abolished* the requirement of grand jury indictment. This meant that the proponents of requiring a grand jury indictment in felony cases had to articulate affirmative reasons for keeping this requirement in our state constitution. But when the delegates engaged in their lengthy debate over whether the Alaska Constitution should include a requirement of grand jury indictment, there was no mention of grand jury

nullification — even though an egregious example of trial jury and grand jury nullification was making national news at the time.

This leads me to conclude that if any of the delegates gave thought to the question of grand jury nullification, they did not view instances of nullification as a positive reason for keeping the requirement of grand jury indictment in Article I, Section 8. Rather, they viewed instances of nullification as a *departure* from a grand jury's proper function.

> (a) *The historical record fails to support Smith's assertion that American law has traditionally encouraged and expected grand jurors to engage in nullification.*

The institution of the grand jury under English law can be traced back to the Middle Ages. [32] But until the late 1600s, the grand jury did not function as a "shield of justice" or a buffer between the monarch and the citizenry. Rather, the grand jury functioned primarily as a prosecutorial arm of the Crown, "oppressive and much feared by the common people". [33] Although grand juries were theoretically convened to screen and impartially evaluate criminal accusations, there was significant pressure on grand

---

[32]  The Constitutions of Clarendon, enacted under King Henry II in 1164, provided in Article 6 that "laymen [*i.e.*, non-clergy] ought not to be accused unless through reliable and legal accusers and witnesses in the presence of the bishop ... . And if those who are inculpated are such that no one wishes or dares to accuse them [publicly], the sheriff, being requested by the bishop, shall cause twelve lawful men of the neighbourhood or town to swear in the presence of the bishop that they will make manifest the truth in this matter, according to their conscience." (Available online through the Yale Law School's Avalon Project: https://avalon.law.yale.edu/medieval/constcla.asp.)

[33]  *United States v. Navarro-Vargas*, 408 F.3d 1184, 1190 (9th Cir. 2005) (*en banc*), quoting Helene E. Schwartz, *Demythologizing the Historic Role of the Grand Jury*, 10 American Criminal Law Rev. 701, 709 (1972).

jurors to return indictments against whomever the Crown accused. English kings and queens were enriched by the confiscated goods and lands of convicted felons, and the Crown would often levy fines against grand juries if they failed to reach their quota of accusations. [34]

The first recorded instance in which a grand jury acted as a shield against royal power was in 1681, when a London grand jury refused to indict the Earl of Shaftesbury after King Charles II sought his indictment on a charge of treason. [35] While the London grand jury's refusal to indict Shaftesbury is often hailed as an early blow against royal tyranny, the truth is more ambiguous: The grand jurors who refused to indict Shaftesbury were hand-picked by the Sheriff of London, who was a political ally of Shaftesbury and a political foe of King Charles II. [36]

---

[34] *Ibid.*

[35] *Id.*, 408 F.3d at 1190–91. For more details, see the article "Shaftesbury, Anthony Ashley Cooper, 1st Earl of" in the 1911 edition of the Encyclopedia Britannica, available through en.Wikisource.org.

[36] The conflict between Shaftesbury and King Charles II was an outgrowth of the 150-year-long political struggle between Protestants and Catholics in England (beginning when Henry VIII broke with the Catholic Church in 1534). Shaftesbury, who was radically anti-Catholic, feared that King Charles would die childless and that Charles's brother James, who was a Catholic, would ascend the throne. Shaftesbury therefore tried several times to have Parliament enact laws that would exclude James from the line of succession and that would require King Charles to divorce his childless wife (so that Charles would remarry and produce an heir who, presumably, would be raised a Protestant). King Charles apparently suspected that Shaftesbury's activities included more than simply asking Parliament to enact anti-Catholic laws, so he sought to have Shaftesbury indicted on a charge of treason.

The Sheriff of London was the official in charge of appointing all the grand jurors in London — and he was a political and religious ally of Shaftesbury. Although there were significant reasons to doubt the evidence against Shaftesbury, the Sheriff decided to take no chances: he packed the grand jury with supporters of the Protestant cause. As anticipated,

(continued...)

But regardless of how one might view the Shaftesbury case, it is clear that the grand jury underwent a major transformation in the American colonies beginning in the late 1600s. The colonies not only adopted the institution of the grand jury; they transformed it by expanding its powers and its sphere of authority — giving it the authority not only to investigate crimes, but also to investigate and report on the functioning of government institutions. This historical development was described by the Ninth Circuit in *United States v. Navarro-Vargas*, 408 F.3d 1184 (9th Cir. 2005) (*en banc*):

> In America, ... grand juries exercised broad, unorthodox powers[:] inspecting roads, jails, and other public buildings; monitoring public works expenditures, construction and maintenance; proposing new legislation; and

---

[36] (...continued) these hand-picked grand jurors refused to indict Shaftesbury.

The following year (1682), King Charles engineered the appointment of a new mayor and a new sheriff in London. This new sheriff seemed sure to appoint grand jurors who would support a renewed effort to indict Shaftesbury, so Shaftesbury fled to Amsterdam. He died there one year later.

As it happened, the English political theorist and philosopher, John Locke, was the long-time employee and personal physician of Shaftesbury's family. Through Locke's writings, and because of the ultimate triumph of the Protestant cause in the Glorious Revolution of 1688, the London grand jury's refusal to indict Shaftesbury came to be seen as a historic protection of individual liberties.

*See* the article "Shaftesbury, Anthony Ashley Cooper, 1st Earl of" in the 1911 edition of the Encyclopedia Britannica, available through en.Wikisource.org; and Michael Barone's "Guide to Government", Lesson 16: "Grand Jury", available at https://www.guidetogovernment.org/2018/06/19/lesson-16-grand-jury/ and the Wikipedia article, "Anthony Ashley Cooper, 1st Earl of Shaftesbury": https://en.wikipedia.org/-wiki/Anthony_Ashley_Cooper,_1st_Earl_of_Shaftesbury.

criticizing poor administration. The colonial grand jury still performed a quasi-prosecutorial role by accusing individuals suspected of crimes, but ... with their expanding quasi-legislative and quasi-administrative roles, grand juries acquired greater popularity because they were regarded as more representative of the people. Through presentments and other customary reports, the American grand jury in effect enjoyed a roving commission to ferret out official malfeasance or self-dealing of any sort and bring it to the attention of the public at large, becoming, as James Wilson put it, a "great channel of communication, between those who make and administer the laws, and those for whom the laws are made and administered."

*Navarro-Vargas*, 408 F.3d at 1191–92.

(The enduring results of this colonial American legal development are found in present-day Alaska law. AS 12.40.030 declares that grand juries "shall have the power to investigate and make recommendations concerning the public welfare or safety", and AS 12.40.060 declares that grand juries are guaranteed access "at all reasonable times" to our state's jails and prisons, to all public offices, and to the examination of all public records in the state.)

Because American colonial grand juries continued to serve their historical role as accusatory bodies, there were occasions in the mid-1700s (during the lead-up to the American Revolution) when colonial grand juries refused to return indictments in high-profile, politically charged cases.

One of the most celebrated examples is the case of John Peter Zenger, a newspaper publisher who was charged with libel in 1734 after he criticized the royal Governor of New York. Under the law at the time (which declared that the truth of a public criticism was no defense to a charge of libel), it seems clear that Zenger was guilty of libel. Nevertheless, successive grand juries refused to indict him — not because of

insufficient evidence, but because the grand jurors were politically opposed to the prosecution. [37]

As the Revolutionary War drew closer, the grand jury became popular in America "at least as much from its success as a political weapon as from its role in the criminal justice system." [38] Not only did colonial grand juries refuse to indict people who committed crimes against British officials and British interests, [39] but they also assumed an active public role in the political conflict between the colonists and the British government.  As explained by the Ninth Circuit in *Navarro-Vargas*,

> Colonial grand juries publicly called for boycotts of British goods, condemned British rule, criticized the use of the tea tax to pay British officials' salaries, and indicted British soldiers for breaking and entering into the homes of private citizens.  Where the king's grand juries had once colluded with the king's prosecutors, in pre-Revolutionary America, colonial grand juries resisted the king's representatives in America.  The historical division of authority between grand juries and prosecutors became a fissure exposing the political division between the colonists and their king.  Grand jurors, selected from the public, frustrated prosecutors loyal to the king by refusing to indict those charged under unpopular laws imposed by the Crown, often [at] the urging of colonial judges.  Grand jury present-ments ... [also] became excellent mediums of propaganda as

---

[37]  *Navarro-Vargas*, 408 F.3d at 1192.

[38]  *Ibid.*, quoting Andrew D. Leipold, *Why Grand Juries Do Not (and Cannot) Protect the Accused*, 80 Cornell Law Rev. 260, 285 (1995).

[39]  See Richard D. Younger, *The People's Panel: the Grand Jury in the United States, 1634–1941* (1963), p. 28, discussing how Boston grand juries refused to indict the editors of the Boston Gazette for libeling the governor of Massachusetts, and likewise refused to indict the leaders of the Stamp Act rebellion.  (Cited in *Navarro-Vargas*, 408 F.3d at 1192.)

grand juries issued stinging denunciations of Great Britain
and stirring defenses of [the colonists'] rights as Englishmen.

*Navarro-Vargas*, 408 F.3d at 1192 (citations and internal quotes omitted).

After the American colonies won their independence and established a federal government, grand juries would still refuse to return indictments from time to time in politically charged cases, even when the evidence apparently justified the accusation.

For example, in the 1790s, during Great Britain's war with republican France, pro-French American grand juries refused to indict Americans who aided the French privateers who were preying on British shipping, even though such assistance violated the federal Neutrality Proclamation. [40]  And at the turn of the 19th century, American grand juries sometimes refused to indict persons who were accused of violating the much-reviled Sedition Act of 1798, which made it a crime to publish any "false, scandalous and malicious writing" critical of either Congress or the President, or to conspire "to oppose any measure or measures of the [federal] government". [41]

Two generations later, in the years leading up to the Civil War, grand juries in the North often refused to indict persons who violated the Fugitive Slave Act — the act which required the residents of the Northern states to aid federal authorities in the capture and return of run-away slaves. [42]

In the years following the Civil War, Southern grand juries worked to frustrate the enforcement of Reconstruction-era laws (laws designed to ensure the rights

---

[40]  *Navarro-Vargas*, 408 F.3d at 1193.

[41]  *Ibid.*, and Wikipedia, "Alien and Sedition Acts": https://en.wikipedia.org/wiki/Alien_and_Sedition_Acts.

[42]  *Navarro-Vargas*, 408 F.3d at 1194.

of the newly freed Black citizenry) by refusing to indict Ku Klux Klan members and other White people who were accused of committing crimes against Black people. As described in *Navarro-Vargas*, these Reconstruction-era grand juries "served as a principal weapon of Southern whites in their struggle against [the Republican Party] and [Black] rights." [43]

Given the politicized role that grand juries played in the years *leading up* to the American Revolution, it might not be surprising that grand juries occasionally engaged in nullification during later periods of political turmoil *after* the Revolution. But what *is* potentially surprising is that grand jurors continued to engage in nullification even though American judges were no longer urging them to flout the law.

As explained by the Ninth Circuit in *Navarro-Vargas*, the judiciary's attitude toward grand jury nullification changed dramatically after the American colonies won the Revolutionary War. Before the American victory, when the law to be ignored was *British* law, colonial judges often encouraged grand jury nullification. [44] But this judicial attitude changed radically after the American colonies won the their independence and the law to be ignored was now *American* law. At that point, American judges began instructing grand jurors that they must *not* engage in nullification — that, instead, grand jurors had a duty to abide by the law and to return an indictment free of favoritism, even when the grand jurors sympathized with the accused or when they disagreed with the law they were being asked to apply. [45]

---

[43] *Navarro-Vargas*, 408 F.3d at 1194–95, quoting Marvin E. Frankel and Gary Naftalis, *The Grand Jury: An Institution On Trial* (2nd ed. 1977), p. 14.

[44] *Navarro-Vargas*, 408 F.3d at 1192: "[Colonial] grand jurors, selected from the public, frustrated prosecutors loyal to the king by refusing to indict those charged under unpopular laws imposed by the Crown, often [at] the urging of colonial judges."

[45] See *Navarro-Vargas*, 408 F.3d at 1193: "In many post-revolution cases, judges
(continued...)

Modern-day state and federal pattern grand jury instructions continue to embody this view of the grand jurors' duty. For example, the federal pattern instructions affirmatively forbid grand jurors from basing their decisions on their individual views about the law, or their individual views about the appropriate punishment for someone who violates a particular law:

> You cannot judge the wisdom of the criminal laws enacted by Congress, that is, whether or not there should or should not be a federal law designating certain activity as criminal. That is to be determined by Congress and not by you.

> Furthermore, when deciding whether or not to indict, you should not consider punishment in the event of conviction.
>
> . . .

> Your task is to determine whether the government's evidence as presented to you is sufficient to cause you to conclude that there is probable cause to believe that the person being investigated committed the offense charged. To put it another way, you should vote to indict where the evidence presented to you is sufficiently strong to warrant a reasonable person's belief that the person being investigated is probably guilty of the offense charged.

---

45 (...continued) instructed [grand] jurors to enforce federal laws, even if the jury thought the laws unjust or unconstitutional. Justice Chase instructed a Philadelphia grand jury that until a law is repealed, even if it is unconstitutional, every citizen has a duty to 'submit to it'. Similarly, Chief Justice Jay explained that a grand juror, just like a judge, must apply the law of the land even if it is a subject of heated public debate[,] as the duty to enforce the law must override 'individual scruples and misgivings.' [This] duty to submit to the laws was a common theme among grand jury charges contemporaneous with the adoption of the Bill of Rights [in the early 1790s]."

*Benchbook for U.S. District Court Judges* (6th edition, 2013), Section 7.04 ("Grand Jury selection and instructions"), Instructions 9, 10, & 25, pp. 249 & 252.

Many states have grand jury instructions which embody this same approach — except that, instead of telling grand jurors that they "should" return an indictment if the evidence supports the charge, several of these states expressly instruct grand jurors that, if they conclude that the evidence supports the charge, they "shall" return an indictment, or that it is their "duty" to return an indictment.[46]

In other words, contrary to Smith's assertions about American legal history, we as a society do not encourage grand jurors to engage in nullification. Quite the opposite.

> *(b)   When the delegates to our constitutional convention debated whether to enact Article I, Section 8, no delegate mentioned grand jury nullification as a reason for preserving Alaska's pre-statehood grand jury requirement, nor did any of the opposing delegates mention nullification as a danger that justified abandoning the grand jury requirement.*

When the delegates to Alaska's constitutional convention debated Article I, Section 8, they were not discussing a straightforward proposal to codify Alaska's existing territorial grand jury requirement in the new state constitution. Rather, the delegates were debating a committee proposal to *eliminate* Alaska's existing grand jury requirement.

The committee assigned to draft Alaska's Bill of Rights (*i.e.*, Article I of our constitution) concluded that, given the protections of modern criminal procedure, the grand jury (as an institution) was antiquated and unnecessary. For this reason, the

---

[46]   Many of these state grand jury instructions (but not Alaska's) are listed in *Navarro-Vargas*, 408 F.3d at 1197.

committee proposed eliminating the requirement of a grand jury indictment in felony cases and, instead, allowing felony prosecutions to go forward based simply on a charging document — an "information" — filed by the prosecutor's office.

In response to this Committee proposal, Delegate Edward Davis introduced an amendment to restore the territorial requirement of a grand jury indictment.

During the ensuing debate, several delegates spoke approvingly of the grand jury's role in screening a prosecutor's charging decisions, and of occasions where territorial grand juries had declined to issue an indictment. Ultimately, the delegates voted to keep the requirement of a grand jury indictment, and this right became codified in Article I, Section 8 of our state constitution.

(The history that I am about to summarize is also recited in *Wassillie v. State*, 411 P.3d 595, 605–07 (Alaska 2018).)

Smith asserts that the convention debate proves that the framers of Alaska's constitution endorsed the principle of grand jury nullification. I agree that the delegates' debate helps to clarify this issue, but I draw a very different conclusion from the delegates' debate. Based on what the delegates said about grand juries, and also based on what the delegates *did not say* about grand juries, I conclude that Article I, Section 8 was not intended to codify or otherwise endorse the practice of grand jury nullification.

### (1) The context of the delegates' debate

As I have already explained, Alaska territorial law required a grand jury indictment in all felony prosecutions, but territorial law also required grand jurors to make their decisions based on the evidence presented to the grand jury, without partisanship or favor.

Section 66-8-27 of ACLA 1949 (the last pre-statehood codification of Alaska law) declared that "the grand jury ought to find an indictment when all the evidence before them, taken together, is such as in their judgment would, if unexplained or uncontradicted, warrant a conviction by the trial jury." At the time of Alaska's constitutional convention, this provision of territorial law had been in effect for more than half a century (ever since the Carter Code of 1900).

In addition, the grand jury oath mandated by territorial law (Section 66-8-3 of ACLA 1949) required grand jurors to "diligently inquire and true presentment make" of all the matters brought before them, to decide these matters "truly and indifferently" (*i.e.*, impartially), to refuse to indict anyone out of "envy, hatred or malice", and to leave no one unindicted because of "fear, affection, gain, reward, or hope thereof".

In sum: When the framers of our state constitution debated whether the Alaska Bill of Rights should include a grand jury requirement, Alaska law had, for decades, imposed duties on grand jurors that were inconsistent with Smith's assertion that our constitution guarantees grand jurors the unfettered discretion to refuse to return an indictment for any reason they see fit.

### *(2) What the delegates said during their debate*

During the debate on whether Alaska should abandon its territorial law requirement of grand jury indictment, several convention delegates spoke in favor of abolishing this requirement. These delegates noted that most other states had already abolished the grand jury or had made grand jury indictment optional at the prosecutor's discretion.[47] These delegates also argued that the grand jury, as an institution, did not

---

[47] *Proceedings of the Alaska Constitutional Convention*, Vol. 2, p. 1323 (remarks of

(continued...)

add anything of substance to the procedural protections already afforded to criminal suspects. Thus, these delegates argued, grand juries would be an unnecessary and costly burden on the new state government. [48]

As I noted earlier, Delegate Edward Davis was the one who introduced the amendment to restore the territorial requirement of a grand jury indictment. Davis told the convention that, in his experience, the grand jury *did* serve a useful purpose — because grand juries could put an early stop to criminal prosecutions that were not supported by sufficient evidence:

> In some cases — not often, it is true — but in some cases, a person against whom criminal charges have been filed by the district attorney or by private parties is released by the grand jury, as there does not appear to be sufficient cause to hold [the person] for trial. That, of course, is the purpose of [requiring an] indictment.

*Proceedings of the Alaska Constitutional Convention* (January 6, 1956), Vol. 2, p. 1322 (quoted in *Wassillie v. State*, 411 P.3d 595, 605 (Alaska 2018)).

Delegate Davis conceded that grand jury proceedings were conducted by prosecutors whose aim, generally, was to procure an indictment. [49] Nevertheless, Davis pointed out that grand juries did, from time to time, decline to issue an indictment.

---

[47] (...continued)
Delegate Seaborn Buckalew), p. 1324 (remarks of Delegate Warren Taylor).

[48] *Proceedings of the Alaska Constitutional Convention*, Vol. 2, pp. 1323 & 1325–26 (remarks of Delegate Seaborn Buckalew), p. 1324 (remarks of Delegate Warren Taylor), pp. 1324–25 (remarks of Delegate Irwin Metcalf), p. 1325 (remarks of Delegate John Hellenthal), p. 1333 (remarks of Delegate Dorothy Awes).

[49] *Proceedings of the Alaska Constitutional Convention*, Vol. 2, p. 1327.

The present grand jury [that] just finished sitting in Anchorage has returned probably ten "no true bills". For those [of you] who are not lawyers, a "no true bill" means that somebody has been charged with a crime by the district attorney, and the district attorney, with all the control of the proceedings before the grand jury, has presented all of his evidence to the grand jury, and, in spite of that, the grand jury has said that there is no cause to hold this man for trial, and the man has been released without going through a trial to a regular jury.

Certainly, under those circumstances, it can't be said that the grand jury serves no useful purpose. It serves a distinctly useful purpose ... . It might be me, it might be you, it might be anybody that was charged with [a] crime and was not guilty of that crime and should be released by a grand jury when the evidence was produced before the grand jury.

. . .

[I acknowledge that, currently, grand juries meet so infrequently that defendants often waive their right to an indictment, so that their cases can go forward. But] I certainly hope that we preserve the right to have the criminal matters investigated by a grand jury if the accused wants it done that way.

*Proceedings of the Constitutional Convention* (January 6, 1956), Vol. 2, p. 1327.

Other convention delegates expressed their faith in the grand jury as an institution that could check the government's power to pursue felony charges in instances where the evidence did not justify a criminal prosecution.

For instance, Delegate Ralph Rivers argued that grand juries served a useful purpose because "sometimes the grand jury will [return] a 'no true bill' ... because the evidence is too flimsy".[50]

Similarly, Delegate Robert McNealy (a former United States attorney) focused his comments on the adverse consequences suffered by innocent people in the occasional case where "our appointed prosecutors become a little overzealous". McNealy described "four or five instances" in which "prominent citizens of the town who were not criminally inclined" nevertheless became the subjects of criminal investigations, but the grand jury refused to indict them, so no harm was done "to the reputation of these few people where it was not warranted."[51]

Delegate Victor Rivers explained that he favored requiring a grand jury indictment to make sure that "a person [who] is innocent does not [have to be] subject[ed] to the blasting of the press that he might be [subjected] to if he goes [to trial]" — for, "even though he be acquitted, he is bound to get a considerable amount of adverse publicity."[52]

Delegate Marvin "Muktuk" Marston agreed that the grand jury could serve as a useful protection for the citizenry. He described a case where a friend of his "came afoul of the law and landed in the jail" and had no money to make bail — meaning that "if that man had had to sit [in jail pending] trial", he "would have lost his job" and "wouldn't have had the money to fight [the charge]". But the grand jury allowed Marston to appear before them and plead the man's case, and the grand jury then

---

[50] *Proceedings of the Alaska Constitutional Convention*, Vol. 2, pp. 1323–24.

[51] *Proceedings of the Alaska Constitutional Convention*, Vol. 2, p. 1331.

[52] *Proceedings of the Alaska Constitutional Convention*, Vol. 2, p. 1335.

returned a "no true bill". Based on that incident, Marston declared that he was going to vote for Delegate Davis's amendment. [53]

Delegate Mildred Hermann seconded this view — explaining that, in her twenty years of experience as a defense attorney in Alaska, she had seen "the misplaced zeal of some of our district attorneys", and she had "seen a great many innocent people plead guilty rather than wait for the grand jury to meet". (At that point in Alaska history, grand juries generally met only once or twice a year.)

Delegate Hermann assured the other delegates that she "[didn't] believe in protecting the guilty", but she "[did] believe in considering [people] innocent until they are proved guilty", and she declared that she had found, from her personal experience, "that the grand jury protects the public — not the criminal nor the alleged criminal, but the public as a whole." For this reason, she announced her support for Delegate Davis's amendment. [54]

Delegate Davis had the last word on his proposal to reinstate the requirement of a grand jury indictment. He told the Convention:

> I am interested in the occasional person who is charged with crime and who is completely innocent of that crime, and so far as I am concerned if even one person is charged with crime, who is innocent, and who may have the matter disposed of without having to stand trial, [then] it's worth the cost [of having a grand jury]. And it seems to be apparent here, from everything that has been said, that in spite of the fact [that] the district attorney controls the grand jury, ... [and] in spite of the fact that the grand jury hears only one side of the thing, the grand jury occasionally, and we might say even frequently, finds there is not cause to hold a man for

---

[53]   *Proceedings of the Alaska Constitutional Convention*, Vol. 2, p. 1330.

[54]   *Proceedings of the Alaska Constitutional Convention*, Vol. 2, pp. 1334–35.

trial who has been charged by the district attorney. That ought to be sufficient to show that the grand jury serves a distinct useful purpose, not for those evilly disposed, but for you and for me and for all of us.

Following this debate, Alaska's constitutional framers overwhelmingly adopted Delegate Davis's proposed amendment — language that ultimately became Article I, Section 8 of our constitution.[55]

### (3) What the delegates *did not say* during their debate

It is important to remember that, during the debate at Alaska's constitutional convention, the delegates were not discussing some idealized or theoretical version of the grand jury. Rather, the delegates were debating whether to abandon the requirement of a grand jury indictment in felony cases or, instead, retain the grand jury as it existed under Alaska territorial law.

At the time of our constitutional convention, Alaska territorial law declared that grand jurors "ought to find an indictment when all the evidence before them ... , if unexplained or uncontradicted, [would] warrant a conviction by the trial jury."[56] This rule had been a fixture of Alaska law since the Carter Code of 1900.[57] During the debate over Article I, Section 8, no delegate voiced any reservation concerning, or objection to, this longstanding Alaska law — even though this law was at odds with the notion that grand jurors could refuse to return an indictment for any reason they saw fit.

---

[55] *Proceedings of the Alaska Constitutional Convention*, Vol. 2, pp. 1336–37.

[56] Section 66-8-27 of ACLA 1949.

[57] Carter Code, Part Two, Section 19.

Likewise, Alaska territorial law (beginning in 1933) required grand jurors to take an oath that they would "diligently inquire and true presentment make" of all the matters brought before them, that they would decide all matters "truly and indifferently" (*i.e.*, impartially), and that they would not leave anyone unindicted "through fear, affection, gain, reward, or hope thereof". [58]

Again, no delegate to our constitutional convention voiced any reservations concerning, or objections to, these precepts during the debate over Article I, Section 8 — even though these precepts, too, are at odds with the notion that grand jurors should be authorized to refuse to return an indictment for any reason they see fit.

The fact that no delegate questioned these duties imposed by Alaska's existing grand jury law is significant because of the context in which the delegates debated whether to codify a requirement of grand jury indictment in the new state constitution. The drafting committee had recommended *abolishing* the requirement of a grand jury indictment. Thus, the delegates who wished to retain the requirement of a grand jury indictment in felony cases had to articulate affirmative reasons for keeping this requirement.

But none of the delegates who spoke in favor of retaining the requirement of grand jury indictment argued, or even suggested, that grand juries were necessary or beneficial because of their power of nullification. No delegate mentioned — much less praised — a grand jury's power to disregard the law or to independently assess the wisdom of the law. No delegate suggested that a grand jury's proper role was to stop the government from pursuing even *well-founded* felony charges if the grand jurors sympathized with the defendant, or if the grand jurors felt antipathy toward the victim of the crime.

---

[58] Section 5167 of CLA 1933 and, later, Section 66-8-3 of ACLA 1949.

Instead, as I have explained, the supporters of the grand jury requirement uniformly spoke of the societal benefit of having grand jurors independently assess whether the evidence reasonably supported the proposed felony charge — so that no one would be forced to endure lengthy pre-trial detention, a felony trial, and the attendant adverse effects on a defendant's reputation, all based on flimsy evidence.

Given the context of this debate — *i.e.*, given the fact that the delegates who supported the requirement of a grand jury indictment had to affirmatively articulate the reasons for keeping this requirement — the delegates' complete silence on the issue of nullification is starkly at odds with any assertion that the convention's decision to approve Article I, Section 8 represented an endorsement of grand jury nullification. It is much more likely that, if the convention delegates considered nullification at all, they viewed it as an unfortunate departure from the grand jurors' duty.

*(c) Conclusion*

Based on this examination of the general history of the grand jury in America, the particular history of the grand jury in Alaska, and the context and content of the debate over the grand jury at Alaska's constitutional convention, I conclude that Article I, Section 8 of our state constitution was not intended to codify a grand jury's right to engage in nullification.

I therefore join my colleagues in holding that the superior court is not required to affirmatively instruct grand jurors that they can engage in nullification. In fact, in my view, it would be consistent with Article I, Section 8 if the superior court affirmatively instructed grand jurors that they *must not* engage in nullification.

V

*The two sides of grand jury nullification — and why we can expect this phenomenon to occur from time to time, regardless of what instructions the superior court gives to grand jurors*

When a grand jury refuses to issue an indictment despite the evidence, or in defiance of the law, any assessment of the grand jury's action will generally depend on the political, social, or moral viewpoint of the person who is doing the assessing. People who approve of a grand jury's refusal to issue an indictment may well view the grand jury's action as a laudable instance of the citizenry standing up to government tyranny or over-reach.

This is how modern-day Americans generally characterize the actions of the colonial grand juries who, in the years leading up to the Revolution, refused to indict people who brazenly violated British tax laws, or who even assaulted and terrorized the officials whose job was to collect those taxes. [59]

---

[59]   *See* Kevin K. Washburn, "Restoring the Grand Jury", 76 Fordham Law Review, 2333, 2346 (2008):

[I]n the paradigmatic cases commonly discussed in the historical narrative, the grand jury's primary method for exercising its power was not a rigorous review of facts, but [rather] a stubborn refusal to enforce general laws [when] the grand jurors [disagreed] with the legislator's right to impose such laws, or at least the prosecutor's decision to enforce them in a given context.  So, for example, the grand jurors ... in the [pre-Revolutionary War] tax protestor cases ... did not believe that the protesters were being wrongly accused of [refusing to pay] their taxes.  Rather, ... the grand juries simply disagreed with the substance of these laws.

*See also* Richard D. Younger, *The People's Panel:  The Grand Jury in the United States, 1634–1941* (1963), p. 28 (noting a Massachusetts grand jury's refusal to indict the leaders of the Stamp Act riots in Boston).   According to the website

(continued...)

But for the many Americans who opposed the separation from England, or who simply valued the rule of law and the settling of disputes through peaceful political means, the actions of these colonial grand juries amounted to public incitements of lawlessness and domestic terrorism.

Indeed, this is how modern-day Americans generally characterize the actions of the post-Civil War grand juries in the South, who were notorious for their refusal to indict White defendants accused of committing violent crimes against newly freed Black citizens. Nowadays, most people would say that these grand juries played a condemnable role in a decades-long campaign of racial terrorism against Black people. But at the time, in the post-Civil War South, the actions of these grand juries "served ... to popularize the grand jury [among White southerners] as a body which embodied and furthered the interests of the local community against an oppressive government, ... a bulwark of liberty."[60]

These instances of nullification are not confined to the distant past. At the very time when the framers of Alaska's constitution were meeting in Fairbanks, the racially motivated murder of a Black teenager, Emmett Till, and the acts of jury and

---

[59] (...continued)
https://www.pbs.org/ktca/liberty/popup_stampact.html, the Stamp Act rioters ransacked the Boston home of the newly appointed stamp commissioner, Andrew Oliver — leading him to resign his position the next day. Thereafter, threats and physical attacks on Crown-appointed stamp commissioners became a popular tactic of tax protestors throughout the colonies. Tarring and feathering began to appear in New England seaports in the 1760s, and it was most often used by patriot mobs against loyalists. By November 1, 1765 — the day the Stamp Act was officially to take effect — there was not a single stamp commissioner left in the colonies to collect the tax.

[60] Ric Simmons, "Re-examining the Grand Jury: Is There Room for Democracy in the Criminal Justice System?", 82 Boston University Law Review 1, 14 (2002).

grand jury nullification that thwarted all attempts to prosecute his murderers, were making national (and international) headlines. [61]

As I explained earlier, most American jurisdictions affirmatively instruct grand jurors that they are required to follow the law, and that they are forbidden from making their decisions based on favoritism toward the defendant or antipathy toward the victim. So how is it that grand jury nullification continues to occur?

Instances of grand jury nullification appear to be the inevitable result of our society's dedication to three legal principles that guarantee the independence of grand juries — principles whose importance outweighs the risk of occasional grand jury nullification. These three principles are:

---

[61] See the Library of Congress article, "The Murder of Emmett Till", https://www.-loc.gov/collections/civil-rights-history-project/articles-and-essays/murder-of-emmett-till/, as well as the time-line of events published on the American Experience website, https://www.pbs.org/wgbh/americanexperience/features/till-timeline/. See also the description found on the website of the University of Missouri (Kansas City) Law School, http://law2.umkc.edu/faculty/projects/ftrials/till/tillaccount.html, the description found on the website of American Public Media, www.apmreports.org/story/2018/06/05/all-white-jury-acquitting-emmett-till-killers, and https://en.wikipedia.org/wiki/Emmett_Till.

On January 24, 1956 (during Alaska's constitutional convention), *Look* magazine published a post-trial interview with one of Till's murderers, J.W. Milam. In this interview, Milam — who was now safe from prosecution — openly bragged about torturing and murdering Till. See "The Shocking Story of Approved Killing in Mississippi" (*Look*, January 24, 1956). At the time, *Look* was one of America's most popular magazines. The U.S. Census Bureau reported that there were 48 million households in America, and *Look* had a circulation of nearly 4 million copies per issue. See https://en.wikipedia.org/wiki/-Look_(American_magazine).

- a grand jury's deliberations should be kept secret;

- grand jurors should not be subjected to civil or criminal sanctions based on their service as grand jurors; and

- no government official or entity should be able to overturn a grand jury's decision not to indict.

While these principles guarantee the grand jury's independence, they also implicitly empower grand jurors to engage in nullification from time to time, especially when political or social tensions are high.

As the Ninth Circuit observed in *United States v. Navarro-Vargas*, no matter what instructions grand jurors might receive, the potential for grand jury nullification will remain so long as our law mandates the secrecy of grand jury deliberations and the non-reviewability of a grand jury's decision not to indict. Grand jurors may depart from the law by refusing to indict for violations of laws that they disagree with, or by improperly taking into account the race, gender, or ethnicity of the accused or the victim. "In all of these cases, for better or for worse, it is the *structure* of the grand jury process and its *function* in our system that makes it independent." *Navarro-Vargas*, 408 F.3d at 1202 (emphasis in the original).

In other words, because grand juries have the *power* to engage in nullification, they will occasionally exercise that power, no matter how they are instructed by the court. But contrary to what Smith argues in this appeal, Alaska courts are not obligated to encourage grand jurors to engage in nullification or to instruct grand jurors that this is their proper function.

As this Court now explicitly holds, grand jurors are bound by the oath set forth in Criminal Rule 6(e)(1) — the oath to "present all things truly and impartially", and to leave no one unindicted "through fear, affection, gain, reward, or hope thereof".

But I conclude that the grand jurors' obligation to dispassionately apply the law is broader than that.

As I have just discussed, the debate at Alaska's constitutional convention shows that the delegates viewed grand jury nullification as an aberration rather than as a right or an essential function of the grand jury.

And as I discussed earlier in this concurrence (at pages 41 through 44), the Alaska Supreme Court and this Court have repeatedly held that when Criminal Rule 6(r) directs grand jurors to decide whether "the evidence ... would warrant a conviction of the defendant", this does not mean that grand jurors are supposed to decide whether *they personally* think the defendant should be convicted of the charged crime. Rather, Rule 6(r) requires grand jurors to decide whether, if the evidence they have heard is later presented to an *impartial* trier of fact who is *required to dispassionately apply the law*, that evidence would warrant that trier of fact (a trial jury or trial judge) in concluding that the defendant was guilty of the charged crime.

I therefore conclude that Criminal Rule 6(r) means what it says: "The grand jury shall find an indictment when all the evidence taken together, if unexplained or uncontradicted, would warrant a conviction of the defendant." And I also conclude that Alaska grand jurors are expected to apply the law dispassionately in all respects when they assess whether a proposed criminal charge is sufficiently supported by the evidence to warrant requiring the defendant to stand trial.

As I have explained, there is no practical way to stop grand juries from engaging in nullification from time to time. But in my view, the superior court would act properly if it affirmatively instructed grand jurors that it is their duty to adhere to the law and to return an indictment if they conclude that the evidence they have heard satisfies the test set forth in Criminal Rule 6(r).